# EXHIBIT 1

Excerpts from Deposition of Pittsburgh Police Officer, Louis  Schweitzer
Pages 14-15, 32-47, 65, 87-90,  95-98

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

\* \* \* \* \* \* \* \*

LENA DAVENPORT, an \*

adult individual, \*

    Plaintiff    \* CIVIL ACTION NO.

    vs.    \* 2:13-cv-00250-DSC

BOROUGH OF    \*

HOMESTEAD, a    \*

Municipal    \*

Corporation; CITY    \*

OF PITTSBURGH, a    \*

Municipal    \* DEPOSITION OF

Corporation; IAN    \* LOUIS SCHWEITZER

STRANG,    \* November 8, 2013

individually and in\*

his official    \*

capacities as a    \*

Police Officer of    \* ORIGINAL

the Borough of    \*

Homestead,    \*

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

JAMES ILGENFRITZ,           *

individually and           *

in his official            *

capacities as a            *

Police Officer of          *

the Borough of             *

Homestead,                 *

LOUIS SCHWEITZER,          *

individually and           *

in his official            *

capacities as a            *

Police Officer of          *

the City of                *

Pittsburgh,                *

STEVEN MATAKOVICH,         *

individually and           *

in his official            *

capacities as a            *

Police Officer of          *

the City of                *

Pittsburgh,                *

DEPOSITION OF

LOUIS SCHWEITZER

November 8, 2013

CALVIN KENNEDY,          *

individually and         *

in his official          *

capacities as a          *

Police Officer of        *

the City of              *

Pittsburgh,              *

THOMAS GORECKI,          *

individually and         *

in his official          *

capacities as a          *

Police Officer of        *

the City of              *

Pittsburgh, and          *

NATHAN HARPER, in        *

his official             *

capacity as a            *

Chief of Police of*

the City of              *

Pittsburgh,              *

     Defendants          *

DEPOSITION OF

LOUIS SCHWEITZER

November 8, 2013

```
 1                    D E P O S I T I O N

 2                         O F

 3      LOUIS SCHWEITZER, taken on behalf of

 4      the Plaintiff herein, pursuant to the

 5      Rules of Civil Procedure, taken before

 6      me, the undersigned, Danielle S. Ohm,

 7      a Court Reporter and Notary Public in

 8      and for the Commonwealth of

 9      Pennsylvania, at the law offices of

10      Lewis, Lewis and Reilly, 1040 Fifth

11      Avenue, Pittsburgh, Pennsylvania, on

12      Friday, November 8, 2013 beginning at

13      10:00 a.m.

14

15

16

17

18

19

20

21

22

23

24

25
```

14

1   A.     Yes.

2   Q.     You'd never discharged your gun

3   prior to that?

4   A.     Well, other than putting down

5   deer, no.

6   Q.     Okay.  How many times did you

7   discharge your weapon on the night in

8   question?

9   A.     To the best of what I remember,

10  four times.

11  Q.     Okay.  And can you tell me what

12  you discharged your weapon ---?

13  Excuse me, can you tell me at what or

14  whom you discharged the weapon?

15  A.     At the driver of a dark-colored

16  Buick.

17  Q.     Dark-colored Buick?  And could

18  you tell me where you shot, as far as

19  the location, using the vehicle

20  primarily as the point of reference?

21  A.     Can you ---?

22  Q.     Tell me where you aimed, and

23  use the vehicle to describe the point

24  you were aiming?

25  A.     The first two, ---

15

1    approximately two to three shots would

2    have been at the driver's side

3    windshield.  And the final shot would

4    have been through the right rear

5    passenger window.

6    Q.     Right rear ---?  The vehicle

7    was past you at that time?

8    A.     It was in the --- it was

9    passing --- not past me, but it was

10   next to me.

11   Q.     It was next to you?

12   A.     Yes.

13   Q.     How far away was it from you?

14   A.     I don't remember exactly, but a

15   couple of feet.

16   Q.     A couple feet?

17   A.     Approximately.

18   Q.     And did you see the right rear

19   window shatter?

20   A.     I don't remember.

21   Q.     Okay.  Did you see any

22   passengers in the vehicle?

23   A.     No.

24   Q.     Had there been any shots fired

25   before your shots?

32

1    long?

2    A.      Inbound was stopped at 17th and

3    Carson.

4    Q.      Did you know about this chase?

5    A.      I'd heard over my radio on

6    Channel Two that Homestead was in

7    pursuit of a vehicle?

8    Q.      Homestead?

9    A.      Yeah.

10   Q.      When you shot at this car, did

11   you have any information as to what

12   make it was or what color?

13   A.      I remember it being a Buick.   I

14   don't remember a color.

15   Q.      You don't remember knowing the

16   color or any information you had?   Is

17   that correct?

18   A.      Not to what I remember what

19   now.  No.

20   Q.      Okay.  Now you testified you

21   didn't remember the color of the

22   vehicle.  You didn't have the license

23   plate; did you?

24   A.      No.

25   Q.      You also testified that you

33

1    didn't know the speed of the vehicle;

2    did you?

3    A.    No.

4    Q.    I mean, you did testify you

5    didn't know?  It's a confusing

6    question.

7    A.    Yes, I do ---.

8    Q.    At the preliminary hearing you

9    said you didn't know that make of the

10   car, the color of the car or the speed

11   of the car?  Isn't that right?

12   A.    Yes.

13   Q.    Okay.  And your testimony at

14   the preliminary hearing was an order

15   at the city court?  You have to say

16   yes.  You can't ---.

17   A.    Yes.  Sorry.

18   Q.    And the District Attorney

19   talked to you before you testified at

20   that hearing; did she not?

21   A.    Yes.

22   Q.    And that was Ms. Necessary?

23   Janet Necessary?  Do you know her?

24   A.    No.  This is the first case I

25   think I've ever been involved with

34

1    her, as far as I know.

2    Q.    So the car was about 25 yards

3    away, and it was in the outbound lane?

4    A.    Yes.

5    Q.    There was no traffic in that

6    lane, because it had been stopped; is

7    that right?

8    A.    Yes.

9    Q.    And you were standing at the

10   intersection of 17th ---?

11   A.    17th and East Carson.

12   Q.    Okay. And you were standing in

13   the inbound lane?

14   A.    Yes.

15   Q.    And there were cars in front of

16   you, because you'd stopped them; is

17   that right?

18   A.    Yes.

19   Q.    Okay. And after you first saw

20   that car 25 yards away, you first saw

21   it, did you immediately take out your

22   weapon?

23   A.    No.

24   Q.    How long did you wait before

25   you took out your weapon?

35

1    A.      Approximately, one to two
2    seconds.
3    Q.      One to two seconds?  All right.
4    And is your weapon holstered with a
5    snap holster top?  Or is it secured
6    with a snap holster top or is it
7    simply open?  You can pull it right
8    out?
9    A.      There's retention on the
10   holster.  You have to defeat the
11   retention to remove the pistol out of
12   it's ---.
13   Q.      Can you explain what kind of
14   retention it is?
15   A.      There's a leather strap over
16   the end of the slide of the pistol.
17   And you have to press a button with
18   your thumb, straight down, which
19   releases the leather strap.  And then,
20   at the same time, you have to push it
21   forward, to remove the pistol.
22   Q.      So you did that?
23   A.      Yes.
24   Q.      And by that time, how far was
25   the car away at that time?

36

1    A.      I'd say approximately 15 to 20

2    yards at that point.

3    Q.      Fifteen (15) to 20 yards?  And

4    had it collided with anybody at that

5    point?

6    A.      Not that I saw, no.

7    Q.      Have you read the reports to

8    determine whether it collided with

9    anybody at that point?

10   A.      I don't believe it did.  No.

11   Q.      Okay.  Now you have your gun

12   out and just tell me the process in

13   your mind.  You had your gun out ---?

14   A.      At that point, I was scared and

15   I thought I was going to die.  And I

16   was concerned for the pedestrians.

17   There was a large amount of

18   pedestrians at the bars.  It was an

19   unseasonably warm night.  And then, at

20   that point, that's when I ---?

21   Q.      And you thought you were going

22   to die?  So could you see how far away

23   was the car when you squeezed the

24   trigger for the first time?

25   A.      I don't remember, exactly.

37

1    Q.      Could you see ---?  You said

2    you shot at the driver?  Is that

3    right?

4    A.      Yes.

5    Q.      Did you see a driver in there?

6    A.      I could see a person in the

7    driver seat, yes.

8    Q.      Was it pretty well lit there at

9    the intersection of 17th and East

10   Carson?

11   A.      There's street lights and

12   lights from the bars and businesses

13   and ---?

14   Q.      Is the answer, yes, that you

15   could see inside the car?

16   A.      I could see the silhouette of a

17   person in the driver's seat; yes.

18   Q.      Okay.  You couldn't see the

19   passenger?

20   A.      I didn't see anybody else with

21   him.

22   Q.      You never saw a passenger?

23   A.      No.

24   Q.      Okay.  So what did you aim for

25   specifically?

38

1    A.    Center mass of what I could

2    see, which would have been ---.    I

3    don't really know how to describe him

4    in the body.    I aimed for center mass

5    of, I guess, which would have been

6    upper chest.

7    Q.    Upper chest?    You could see his

8    upper chest?

9    A.    Well, I could see the

10   silhouette of a person.    I couldn't

11   see his exact upper chest.    But, yeah.

12   Q.    So you shot at him the first

13   time?

14   A.    Yes.

15   Q.    How far was the car at that

16   point?    How far away?

17   A.    When?

18   Q.    When you shot?

19   A.    Like, I said approximately, 15

20   to 20 yards away.

21   Q.    Fifteen (15) to 20 yards?    And

22   then how long did you wait to shoot

23   your second bullet?

24   A.    Timewise, I have no idea.    It

25   was as the vehicle passed me to my

39

1   right.

2   Q.    As the vehicle passed to your

3   right, you shot your second bullet; is

4   that correct?

5                ATTORNEY CAMPBELL:

6                Wait.

7                ATTORNEY LEWIS:

8                Come on, come on, Bryan.

9         Okay, he wants to say ---

10        there's no objection.

11               ATTORNEY CAMPBELL:

12               Well, I'm just

13        objecting, because he said he

14        fired three shots and then as

15        the man ---

16               ATTORNEY LEWIS:

17               No, he didn't.

18               ATTORNEY CAMPBELL:

19               --- went by he

20        fired ---.

21               ATTORNEY LEWIS:

22               Oh, man, Brian.  Why

23        don't you tell him what to

24        testify to?  Go ahead.

25               ATTORNEY CAMPBELL:

40

1          Well, because you're

2     trying to trick him.  That's

3     why.

4          ATTORNEY LEWIS:

5          I'm not trying ---.  I'm

6     asking him to describe this

7     second ---.

8          ATTORNEY CAMPBELL:

9          You said the second

10    shot.  And, ---

11         ATTORNEY LEWIS:

12         The second shot ---.

13         ATTORNEY CAMPBELL:

14         --- what he's referring

15    to is after it went by.

16         ATTORNEY LEWIS:

17         Okay, okay.  I'm sorry.

18         ATTORNEY CAMPBELL:

19         Yes.

20         ATTORNEY LEWIS:

21         Do you want to say

22    anymore?

23         ATTORNEY CAMPBELL:

24         No.

25         ATTORNEY LEWIS:

41

1              Okay.
2              ATTORNEY CAMPBELL:
3              But I'm just saying, you
4         don't mislead a witness.
5    BY ATTORNEY LEWIS:
6    Q.    Am I misleading you, Mr.
7    Schweitzer --- or Officer Schweitzer?
8    Did I mislead you right there when I
9    asked you when you shot the second
10   bullet?
11   A.    The second bullet, the vehicle
12   would have still been in front of me
13   at that time.
14   Q.    Is that what you want to clear
15   up?
16   A.    I fired two to three times.
17   Q.    Excuse me.
18   A.    The vehicle was in front of me.
19   Q.    Excuse me.
20   A.    Okay.
21   Q.    I'm asking about the second
22   bullet.
23   A.    The second bullet, the vehicle
24   was still in front of me, traveling.
25   Q.    Okay.  And did you see the

42

1  passenger at that point?

2  A.     I never saw a passenger in the

3  vehicle.

4  Q.     Okay.  Did you shoot the second

5  bullet?

6  A.     Yes.

7  Q.     Where'd you aim that bullet?

8  A.     At the driver.

9  Q.     Okay.  And how far away was the

10  car at that point?  Can you recall?

11  A.     No.

12  Q.     Okay.  Now, you shot a third

13  time, as Mr. Campbell indicated.  Is

14  that right?

15  A.     Yes.

16  Q.     Okay.

17            ATTORNEY HAMILTON:

18            Well, and he prior

19       indicated too, the witness

20       testified to that.

21            ATTORNEY KENNEDY:

22            I'll object to the form

23       of the question, as well.

24            ATTORNEY LEWIS:

25            Okay.

43

BY ATTORNEY LEWIS:

Q.      They're objecting to the form
of the question.  Did you shoot a
third shot?

A.      Yes.

Q.      Okay.  Where was the car at
that point?

A.      In front of me.

Q.      The third shot was in front of
you, too?

A.      To the best of what I remember,
yes.

Q.      Okay.  And where did you shoot
that?

A.      At the driver.

Q.      At the driver, the third time?

A.      Yes.

Q.      Okay.  How far away was the car
when you shot the third time?

A.      I don't remember.

Q.      Okay.  And as the car passed
you on the outbound lane, ---

A.      Uh-huh (yes).

Q.      --- you shot a fourth time;
didn't you?

44

1    A.      Yes.

2    Q.      Okay.  So you did shoot four

3    times?

4    A.      To the best of what I remember,

5    yes.

6    Q.      Okay.  And when you shot the

7    fourth time, you shot through the rear

8    window on the passenger side; is that

9    right?

10   A.      It would have been the right

11   passenger window.  Yes.

12   Q.      Okay.  And how far away was the

13   vehicle from you at that point?

14   A.      Approximately, a couple feet.

15   Q.      Okay.  And you were still

16   standing, as you said, in the inbound

17   lane, about two, three feet from the

18   center line?  Is that right?

19   A.      Approximately, yeah.

20   Q.      Okay.

21   A.      I believe I moved to my left to

22   try to get out of the way of the

23   vehicle, so ---.

24   Q.      You mean, as you started to

25   shoot you moved a little more to your

45

1    left?  Is that right?

2    A.    To the best of my memory, yes.

3    Q.    And you had the traffic stopped

4    in front of you?  Is that right?

5    A.    Yes.

6    Q.    Were you concerned at any time

7    that you might have the wrong ---

8    never mind.  So the car went past you

9    after the fourth shot.  What happened

10   to the car after that?  Did you

11   observe it?

12   A.    I lost sight of the vehicle

13   after that.

14   Q.    What happened to the car after

15   that?  Did you observe it?

16   A.    I had lost sight of the vehicle

17   after that.

18   Q.    You did?

19   A.    After it passed me.  Once, it

20   went beyond 16th Street.

21   Q.    Well, did you see it go from

22   17th Street down to 16th Street?

23   A.    Yes.

24   Q.    And did it --- were there any

25   pedestrians in the roadway; at that

46

1    time?

2    A.      To my left there was, yes.

3    Q.      To your left?

4    A.      Yes.

5    Q.      Would that be in the inbound

6    lane?

7    A.      Yes.

8    Q.      Okay.  But the car's in the

9    outbound lane; isn't that right?

10   A.      It had traveled back into the

11   inbound lane, once ---.  It went

12   around me, back into the inbound lane.

13   Q.      Well, it went past you?  It

14   didn't go around you; did it?

15                   ATTORNEY CAMPBELL:

16                   Object to the form of

17             the question.

18   BY ATTORNEY LEWIS:

19   Q.      How did it go around you, if it

20   was in the outbound lane and you were

21   in the inbound lane?  How did it go

22   around you?

23   A.      When the vehicle was traveling

24   at me, it was traveling at me towards

25   the inbound lane.

47

1    Q.    He was going to travel into the
2    inbound lane?
3    A.    Yes.
4    Q.    So did he ever get into the
5    inbound lane?
6    A.    After it passed me.
7    Q.    After he passed you?
8    A.    Yes.
9    Q.    How far past was he, when he
10   got into the inbound lane?
11   A.    I don't know.
12   Q.    You saw him all the way down to
13   the 16th Street; didn't you?
14   A.    Well, distance-wise, I don't
15   know.  It was approximately --- he got
16   back into the inbound lane, right near
17   16th and East Carson.
18   Q.    Okay.  So, he's going from 17th
19   Street to 16th Street in the outbound
20   lane or the other lane from which you
21   were standing?  Is that right?
22   A.    Yes.
23   Q.    What happened to the car at
24   16th Street?
25   A.    It continued traveling inbound.

65

1    standing next to the front door, the

2    front entrance of Diesel.  It would

3    have been to our right, the entrance.

4    And then we had heard that --- or

5    Channel Two dispatch was advising City

6    units that there was a --- I believe

7    it was Homestead or West Homestead was

8    involved in a pursuit, which was

9    traveling inbound on, I think the name

10   of the road is River Road.  I don't

11   remember.

12        And they continually updated

13   the location of the pursuit of the

14   vehicle.  At one point, it stated it

15   was crossing over --- I think it's

16   Becks Run Road, is the name of the

17   road, continuing inbound.  And then

18   when it reached the, I want to say it

19   was the FBI Building, is what it was

20   put out earlier, that's when I

21   remember hearing 3380, whoever that

22   was that night --- which would have

23   been the supervisor, terminated the

24   pursuit.

25   Q.    You heard that?

87

1    Homestead vehicles and the crash ---?

2    A.    Yes.

3    Q.    There were crash vehicles?

4    Okay.  At the time of this incident,

5    were you familiar with policies

6    regarding the discharge of firearms

7    toward motor vehicles that were

8    occupied?

9    A.    I do, but I don't know the

10   exact policy?  But I was aware of a

11   policy, yes.

12   Q.    Did you know what the policy

13   was?

14   A.    I believe it stated something

15   along the lines of a motor vehicle has

16   to be being used as a weapon in order

17   to use deadly force on the

18   occupants ---

19   Q.    Okay.

20   A.    --- on the driver, I mean.

21   Q.    Okay.  Are you aware of anybody

22   that ---?  Did any of the officers

23   that were involved in this incident,

24   did any of them ever discuss with you

25   whether they discharged their weapons?

88

1    Did they ever discuss that with you?

2    A.     That night, they may have.  I

3    don't really see many of them, because

4    I'm not assigned to the same unit.

5    Q.     That night, they might have?

6    A.     Uh-huh (yes).

7    Q.     The officers, I'm going to name

8    them each one.  You can tell me what

9    you recall.  Officer Kennedy?  Did he

10   tell you that he discharged his

11   weapon?

12   A.     I don't remember.  I remember

13   speaking with him.  I don't remember

14   the contents of the conversation.

15   Q.     Do you remember speaking to him

16   at the narcotics office, while you

17   were waiting to be interviewed by the

18   homicide detectives and the DA?

19   A.     I remember speaking with him

20   there, yes.

21   Q.     Okay.  Do you remember speaking

22   with Officer Gorecki?

23   A.     Yes.

24   Q.     Did you remember saying ---?

25   Excuse me, do you remember Officer

89

1    Gorecki telling you that he shot twice

2    through the driver's side window?

3    A.      No.

4    Q.      Do you remember what he told

5    you?

6    A.      No.

7    Q.      Do you recall what Sergeant

8    Matakovich ---?

9    A.      Matakovich (corrects

10   pronunciation).

11   Q.      Do you remember what, if

12   anything, he said to you?

13   A.      No.  I remember speaking with

14   him.  Like, once again, but I don't

15   remember exactly what was said.

16   Q.      Sergeant Matakovich?

17   A.      Matakovich (corrects

18   pronunciation).

19              ATTORNEY HAMILTON:

20              Matakovich (corrects

21         pronunciation).

22   OFF RECORD DISCUSSION

23   BY ATTORNEY LEWIS:

24   Q.      Did Sergeant Matakovich say to

25   you that the City's policy regarding

90

1    firing at occupied vehicles is

2    something that doesn't make sense or

3    he's not going to follow?  Did he say

4    that to you?

5    A.    I don't remember.

6    Q.    When you made your decision to

7    shoot at this vehicle, at any time

8    prior to that or at the time that you

9    shot, did the City's policy even come

10   into your mind?

11   A.    No.

12   Q.    You've already testified that

13   you shot at the driver's, what you

14   believe to be his chest?

15   A.    Yes.

16   Q.    Is that correct?  Have you ever

17   been involved in any collisions with a

18   police vehicle?

19   A.    Yes.

20   Q.    Accidents involving ---

21   A.    Yes.

22   Q.    --- personal injury?

23   A.    I don't ---.  Meaning, I was

24   injured or ---?

25   Q.    Anybody involved in the

95

1    A.      Approximately, six years.  Yes.

2    Q.      When did you complete your

3    Academy training?

4    A.      It was approximately March of

5    2008

6    Q.      Okay.  So it would appear that

7    your only experience as a licensed

8    uniform police officer is that for the

9    City of Pittsburgh?

10   A.      Yes.

11   Q.      How old are you, sir?

12   A.      Thirty-seven (37).

13   Q.      Prior to becoming a police

14   officer, what was your occupation?

15   A.      I was a heavy equipment

16   mechanic at OK Grocery.

17   Q.      Now, as I understand it, on the

18   night, early morning hours of the

19   incident which gives rise to this

20   lawsuit, when you first saw the Burris

21   vehicle, you were standing in ---

22   close to the middle of East Carson

23   Street?

24                ATTORNEY LEWIS:

25                Objection.  He didn't

96

1      say close to the middle.  He

2      said he was standing in the

3      inbound lane, about two or

4      three feet from the center

5      line.

6                ATTORNEY HAMILTON:

7                That's close to the

8      middle.

9                ATTORNEY LEWIS:

10               Okay.

11               ATTORNEY HAMILTON:

12               Okay.

13               ATTORNEY LEWIS:

14               Well, you ought to go

15      down there and look at it.

16   BY ATTORNEY HAMILTON:

17   Q.      You're standing in the inbound

18   lane of East Carson Street?

19   A.      Yes.

20   Q.      At its intersection with 17th

21   Street?

22   A.      Yes.

23   Q.      Okay.  And you're facing

24   outbound?

25   A.      Yes.

97

1    Q.      Okay.  And when you first see

2    the Burris vehicle --- and if you have

3    to look at any of these exhibits, take

4    your time, pull them over and look at

5    them.  But when you first see the

6    Burris vehicle, it's about 25 yards in

7    front of you?

8    A.      Approximately, yes.

9    Q.      Okay.  Headed toward you?

10   A.      Yes.

11   Q.      And it's headed toward you in

12   the outbound lane?

13   A.      Yes.

14   Q.      Okay.  Any other vehicles at

15   the time of that observation did you

16   observe also in the outbound lane?

17   A.      No.

18   Q.      Okay.  Now, you said the

19   traffic headed inbound on East Carson,

20   at the intersection of 17th was

21   stopped at that intersection; correct?

22   A.      Yes.

23   Q.      You had stopped it?

24   A.      Yes.

25   Q.      Okay.  At the time you first

98

1    saw the Burris vehicle, can you give

2    me an estimate, or as exactly as you

3    can, how many vehicles you recall

4    being stopped in the inbound lane of

5    East Carson Street?

6    A.    As far as I can see.

7    Q.    Would that take then, if you

8    know, beyond the intersection with

9    18th?

10   A.    Do you mean was the vehicles

11   stopped that far?

12   Q.    Uh-huh (yes).

13   A.    I don't know. I couldn't see

14   that far. I'm short. It's hard for

15   me to see over the top of cars.

16   Q.    Yes. Is there a traffic light

17   up at 18th?

18   A.    I think so, yes.

19   Q.    Do you recall if, you know, you

20   saw it as you're visualizing this

21   scene from where you were standing at

22   17th?

23   A.    I don't remember seeing it, no.

24   Q.    Do you actually remember the

25   Burris vehicle actually pulling out