**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LENA DAVENPORT**, an adult individual, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 2:13cv250 |
| ) | **Electronic Filing** |
| **BOROUGH OF HOMESTEAD,** a Municipal ) | |
| Corporation; **CITY OF PITTSBURGH,** a ) | |
| Municipal Corporation; **IAN STRANG**, ) | |
| individually and in his official capacities as a ) | |
| Police Officer of the Borough of Homestead; ) | |
| **JAMES ILGENFRITZ**, individually and in his ) | |
| official capacities as a police officer of the ) | |
| Borough of Homestead; **LOUIS SCHWEITZER,** ) | |
| individually and in his official capacities as a ) | |
| Police Officer of the City of Pittsburgh; **STEVEN** ) | |
| **MATAKOVICH**, individually and in his official ) | |
| capacities as a Police Officer of the City of ) | |
| Pittsburgh; **CALVIN KENNEDY**, individually ) | |
| and in his official capacities as a Police Officer ) | |
| of the City of Pittsburgh; **THOMAS GORECKI**, ) | |
| Individually and in his official capacities as a ) | |
| Police Officer of the City of Pittsburgh; **NATHAN** ) | |
| **HARPER**, in his official capacity as Chief of ) | |
| Police of the City of Pittsburgh; **JEFFREY** ) | |
| **DeSIMONE**, in his official capacity of Chief of ) | |
| Police of Borough of Homestead; and **IGOR** ) | |
| **BOYKO**, individually and in his official capacity ) | |
| of a police Officer of the City of Pittsburgh, ) | |
| ) | |
| Defendants. ) | |

## OPINION

Plaintiff Lena Davenport ("plaintiff" or "Davenport") commenced this civil rights action

seeking damages arising from injuries sustained in the early morning hours of January 13, 2013,

after a police pursuit initiated by Borough of Homestead police officers ended with the discharge

by several City of Pittsburgh police officers of their weapons at the vehicle in which she was a

passenger, resulting in her being shot.  Davenport sues the Borough of Homestead

("Homestead"), Homestead police officers Ian Strang and James Ilgenfritz; Homestead Chief of

Police Jeffrey DeSimone; the City of Pittsburgh ("Pittsburgh"); Pittsburgh police officers Louis Schweitzer, Sgt. Stephen Matakovich, Det. Calvin Kennedy, Thomas Gorecki and Ivan Boyko, and former Pittsburgh Chief of Police Nathan Harper.[1]  Davenport brings this action pursuant to the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983.  Davenport's second amended complaint asserts claims for deprivation of substantive due process in violation of the Fourteenth Amendment against all parties (First, Second,[2] Fifth and Sixth causes of action), claims for use of excessive force in violation of the Fourth Amendment against the City of Pittsburgh, its former Chief of Police and five of its officers (Third and Fourth causes of action), and claims under state law for assault and battery and intentional infliction of emotional distress against the City of Pittsburgh and the Pittsburgh police officers (Seventh and Eighth causes of action).

Presently before the court are Homestead Defendants' motion for summary judgment; Pittsburgh Defendants' motion for summary judgment; and Davenport's motion for summary judgment on her claims against the Borough of Homestead.   For the reasons set forth below, the Homestead Defendants' motion for summary judgment will be granted, Davenport's motion for summary judgment will be denied, and the Pittsburgh Defendants' motion for summary judgment will be granted in part and denied in part.


I.      PROCEDURAL BACKGROUND

---

[1] The police officers of the Borough of Homestead ("Homestead police officers") and the Borough of Homestead are collectively referred to as "Homestead Defendants."  The police officers of the City of Pittsburgh ("Pittsburgh police officers"), the City of Pittsburgh, and Chief Harper are collectively referred to as "Pittsburgh Defendants."

[2] Although the Second cause of action is labelled in the Second Amended Complaint (ECF No. 42) as the Fourth cause of action, as it follows the First cause of action and precedes the Third cause of action and as there is also a cause of action after the Third cause of action labelled the Fourth cause of action, the Court refers to it as the Second cause of action.

Plaintiff commenced this action on February 15, 2013. After discovery, the Homestead Defendants filed their Motion for Summary Judgment with Brief in Support, Concise Statement of Material Facts, and Appendix on September 28, 2015, (ECF Nos. 91, 92, 93, 94), the original deadline set for filing summary judgment motions. On September 28, 2015, the Pittsburgh Defendants filed a consent motion for extension of the deadline. (ECF No. 89). The Pittsburgh Defendants filed their Motion for Summary Judgment with Brief in Support, and Concise Statement of Material Facts with Appendix on October 5, 2015. (ECF Nos. 95, 96, 97). Davenport filed her Motion for Summary Judgment with Respect to the Liability of Defendant the Borough of Homestead on October 5, 2015, with Brief in Support, and Concise Statement of Material Facts. (ECF Nos. 98, 99, 100). Davenport filed her Appendix in Support of Summary Judgment on October 6, 2015. (ECF No. 101). On October 7, 2015, the court entered an order on the consent motion providing that "[a]ny Dispositive Motion is to be filed on or before October 5, 2015." (ECF No. 102). Davenport filed her response in opposition to the Homestead Defendants' motion for summary judgment, including her Brief in Opposition, her Concise Statement of Material Facts in Opposition (as corrected) and her Appendix. (ECF Nos. 104, 105, 106, 107, 129). Davenport filed her response In opposition to the Pittsburgh Defendants' motion for summary judgment, including her Brief in Opposition (as corrected), her Concise Statement of Material Facts in Opposition (as corrected), and her Appendix (ECF Nos. 108, 111, 112, 113, 114, 115, 130). Homestead Defendants filed a Reply and a Counter-Concise Statement in support of their motion for summary judgment with Supplemental Appendix. (ECF No. 117, 118, 120). Pittsburgh Defendants filed a Reply in Support of their motion for summary judgment with brief in support containing additional appendix items, and a Reply to Plaintiff's Concise Statement of Undisputed Material Facts, a Reply to Plaintiff's Response to Pittsburgh

Defendants' Concise Statement of Undisputed Material Facts and a Reply to the Corrected Concise Statement of Undisputed Facts. (ECF Nos. 124, 125, 126, 131).

Nearly two weeks after Davenport filed her motion for summary judgment, Homestead filed a motion to strike Davenport's motion for summary judgment as untimely, disputing that the parties had consented to an extension of time for the filing of a summary judgment motion by any party other than the Pittsburgh Defendants. (ECF No. 103). Davenport responded indicating that the consent requested of her was to extend the deadline for any party to file such a motion. (ECF No. 116). As the proposed order provided to and entered by the court expressly provided an extension for any dispositive motion and no objection to the order was filed by any party, the court denied the motion to strike and ordered Homestead to respond. (ECF No. 132). As ordered, Homestead then filed its response in opposition and response concise statement of facts (ECF Nos. 135, 136), and Davenport filed her reply in support with a reply to the response concise statement of facts. (ECF Nos. 137, 138). Thus, presently pending for the court's determination on the above filings are the Motions for Summary Judgment filed by Homestead Defendants, Pittsburgh Defendants, and Davenport (ECF Nos. 91, 95, 98).

II.     SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A). Rule 56 "'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). Deciding a summary judgment motion requires the court to view the facts, draw all

reasonable inferences and resolve all doubts in favor of the nonmoving party. <u>Doe v. Cnty. of Centre, Pa.</u>, 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. <u>Nat'l State Bank v. Fed. Reserve Bank of New York</u>, 979 F.2d 1579, 1581-82 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. <u>Matsushita Electric Industrial Corp. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (<u>quoting</u> Fed. R. Civ. P. 56(E)) (emphasis in <u>Matsushita</u>). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion . . . and cannot simply reassert factually unsupported allegations." <u>Williams v. Borough of West Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." <u>Harter v. GAF Corp.</u>, 967 F.2d 846, 852 (3d Cir. 1992); <u>Sec. & Exch. Comm'n v. Bonastia</u>, 614 F.2d 908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment."). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. <u>Robertson v. Allied Signal, Inc.</u>, 914 F.2d 360,

382-83 n.12 (3d Cir. 1990).  If the non-moving party's evidence is merely colorable or lacks

sufficient probative force summary judgment may be granted.  <u>Anderson</u>, 477 U.S. at 249-50;

<u>see</u> <u>also</u> <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992)

(although the court is not permitted to weigh facts or competing inferences, it is no longer

required to "turn a blind eye" to the weight of the evidence).

"Where the party moving for summary judgment is the plaintiff, or the party who bears

the burden of proof at trial, the standard is more stringent."  <u>National State Bank v. Federal</u>

<u>Reserve Bank</u>, 979 F.2d 1579, 1582 (3d Cir. 1992).  The Court of Appeals for the Third Circuit

has explained that "where the movant bears the burden of proof at trial and the motion does not

establish the absence of a genuine factual issue, the district court should deny summary judgment

even if no opposing evidentiary matter is presented."  <u>Id.</u> (citing <u>Resolution Trust Corp. v. Gill</u>,

960 F.2d 336, 340 (3d Cir. 1992)).

III.    FACTUAL BACKGROUND

For purposes of the motions for summary judgment filed by the Homestead Defendants

and the Pittsburgh Defendants, the record and all reasonable inferences therefrom are construed

in the light most favorable to Davenport and establishes the background set forth below.[3]

On Sunday, January 13, 2013 at 1:38 a.m., Davenport was a passenger in the vehicle

("the Burris vehicle") driven by her son, Donald Burris, Jr. ("Burris").  (ECF Nos. 93, 129 at ¶

1).  Homestead Officer Strang observed the Burris vehicle travel through a solid red light in

the Borough of Homestead, Pennsylvania.  (ECF Nos. 93, 129 at ¶¶ 1, 2).  Homestead Officer

Strang pulled his police cruiser behind Burris' vehicle and attempted to make a stop of the

Burris vehicle, but the driver did not stop and Officer Strang commenced pursuit.  (ECF Nos.

_____

[3] Additional facts also are discussed where relevant in subsequent sections of this opinion.

93, 129 at ¶¶ 3, 4). As Homestead Officer Strang initiated pursuit he obtained information on the registration of the vehicle and called it into dispatch. (ECF 106 ¶ 9). Officer Strang also reported to dispatch that two people were inside the vehicle being pursued, which appeared to be a green Buick. (ECF Nos. 106 at ¶ 12; 107-1(c)). The Burris vehicle travelled westbound on 8th Avenue into the Borough of West Homestead at a speed of approximately 35 miles per hour ('mph"). (ECF Nos. 93, 129 ¶ 5). Homestead Officer Strang followed the Burris vehicle as it proceeded onto the Carson Street exit that leads into the City of Pittsburgh. (ECF Nos. 93, 129 ¶ 6). At some point, Homestead Officer Ilgenfritz had joined the pursuit and took the lead on request of Homestead Officer Strang by radio communication. (ECF Nos. 93, 129 ¶ 8). Office Ilgenfritz also could observe that there was a passenger in the vehicle. (ECF No. 107-6 at 110). During the entire pursuit by the Homestead police officers, the fastest speed reached by the Burris vehicle was approximately 45 mph. (ECF No. 93, 129 ¶ 12 (A)).

Burris, pursued by the Homestead police officers, eventually headed towards East Carson Street on the South Side of Pittsburgh and the bar district on portions of East Carson Street ("the bar district"), where there are bars and restaurants and pedestrian and vehicular traffic at the time of the early morning hours when the pursuit took place. (ECF Nos. 106 at ¶¶ 20, 21; 107-1(b)). Homestead police officer Ilgenfritz continued his pursuit into the City of Pittsburgh observing that the Burris vehicle was not travelling at a high speed, and prior to the intersection of East Carson Street with 24th Street had not hit any traffic or red lights. The Homestead police officers had kept pace with the Burris vehicle but at a greater following distance at that point. (ECF No. 107-6 at 11, 12, 14; 107-4 at p. 47-48).

Burris continued to drive on his in-bound path to the City of Pittsburgh on East Carson Street. As the Burris vehicle neared the bar district, while Pittsburgh police officers were either attempting to join the pursuit or had already joined the pursuit, Sergeant James E. Perry

of the Pittsburgh Police (Pittsburgh Sgt. Perry) ordered Pittsburgh police officers to terminate pursuit at approximately 1:42 am. (ECF No. 94-13 at 5-11). This termination subsequently was communicated by Allegheny County 911 dispatch to the Homestead police officers at approximately 1:44 am.

Meanwhile, "stop strips" had been deployed by Pittsburgh police in the roadway near the intersection of East Carson Street and 24th Street to stop the Burris' vehicle from continued flight into the bar district. (ECF Nos. 93, 129 at ¶ 12; 106 at ¶ 17. Burris, however, drove the vehicle temporarily into out-bound lane of East Carson Street to avoid "stop strips," (ECF Nos. 93, 129 at ¶ 12), but at some point returned to the in-bound lane. (ECF no. 112-1 at 22). After the Burris vehicle passed the area of the stop strips and by the time Homestead police officer Ilgenfritz reached the intersection of East Carson and 24th Street, the stop strips were removed from the road. (ECF No. 94-5 at 3).

Homestead police officer Ilgenfritz was approximately 100 yards away from the Burris vehicle at the location where the stop sticks had been deployed and had backed off prior to reaching that location. (ECF No. 94-5 at 3). Officer Ilgenfritz stopped his car at the intersection of 17th and East Carson and could no longer see the Burris vehicle. (ECF No. 107-6 at 16). Officer Ilgenfritz testified that during his pursuit of the Burris vehicle prior to reaching the stop sticks that the Burris vehicle had not run through any additional red lights or placed passing motorists in jeopardy. (ECF No. 107-6 at 20). Burris testified as well that he was not speeding, and as he continued to drive home he was trying to do it in a safe manner so as not to hurt others. (ECF 94-10 at 4, 5).

Off-duty Pittsburgh police officers Schweitzer, Matakovich, Kennedy and Gorecki, who were all on foot, encountered the Burris vehicle at various points along East Carson Street where they were working security at different establishments. (ECF Nos. 112-1 at 8, 24; 112-2

8

at 6, 12; ECF 112-3 at 8, 13; 112-4 at 6-9). These Pittsburgh police officers had heard of the pursuit through Pittsburgh police radio communications. (ECF Nos. 112-1 at 8, 24; 112-2 at 6, 12; ECF 112-3 at 8, 13; 112-4 at 6-9).  Pittsburgh police officers Schweitzer, Matakovich, Kennedy, and Gorecki headed outside to the street and discharged their service weapons into the passenger compartment of the Burris vehicle as it drove by them at their locations at different points from approximately the intersection of East Carson Street with 17th Street and until the Burress vehicle approached the 13th Street Intersection. (ECF Nos. 112-1 at 14-17; 112-2 at 26, 29-33; 112-3 at 10-11; 112-4 at 12-17; at  94-6 at 3); 107-1(b)) .

The bar district was relatively well lit that night. (ECF No. 112-1 at 13; 112-3 at 19).  In addition to the pursuing Homestead police officers from their respective patrol vehicles having observed a passenger in the Burris vehicle as it drove in front of them, a bystander in the area of East Carson Street at the time was able to discern through a shop window at about the intersection of 15th and East Carson Street that there was a male driver and a female passenger in the Burris vehicle as it passed by her location.  (ECF No. 115 ¶¶ 40, 41, Ex. 7 [COP 118-119], Ex. 8).  After several shots were fired at the passenger compartment of the Burris vehicle as it was driven a couple of blocks, the Burris vehicle hit a black Hyundai parked at about the North curb of East Carson at 15th Street, which was the first vehicle with which it collided. (ECF No. 115 ¶ 38, Ex. 7 [COP 66-68]).  The Burris vehicle eventually came to a stop at or near the intersection of East Carson Street and 13th Street after it collided with another vehicle and then finally collided with a Classy Cab.  (ECF Nos. 93, 129 ¶ 16; 97-2 at 10; 107-1(b)).

Pittsburgh police officer Schweitzer was the first to discharge his firearm at the Burris vehicle, which occurred at about the intersection of 17th and East Carson Street. (ECF No. 112-1 at 10- 21). When the Burris vehicle drove past him, Pittsburgh police officer Schweitzer was in the in-bound lane approximately three feet from the center lane, (ECF No. 112-1 at 44), in-

9

bound traffic was stopped, no other traffic was in the out-bound lane, and the Burris vehicle was driving in-bound but was in the out-bound lane. (ECF No. 112-1 at 20-21). Pittsburgh police officer Schweitzer was close enough to see the driver and shot three times directly at the Burris vehicle as it drove by him, including shooting through the right front side passenger compartment. (ECF No. 112-1 at 20). The Burris vehicle had not hit any other vehicle at that point. (ECF No. 112-1 at 12).

Officers Matakovich and Kennedy both encountered the Burris vehicle and discharged their weapons at it from about the intersection between 16th Street and 15th Streets and East Carson Street. Officer Matakovich was standing in the middle of the street between 15th and 16th Streets. (ECF No. 112-2 at 26-30). Officer Kennedy was also in the street in that area, in the in-bound lane just off the center yellow lines and the Burris vehicle was in the out-bound lane. (ECF No. 112-3 at 10-11, 15). Both Officers Kennedy and Matakovich were in the in-bound lane facing the Burris vehicle travelling down East Carson Street with Officer Matakovich to the left of Officer Kennedy when they discharged their weapons and the Burris vehicle was in the out-bound lane. (ECF No. 112-3 at 17).

At the time when the Burris vehicle encountered Pittsburgh police officer Gorecki, Pittsburgh police officers had been firing at the Burris vehicle and Davenport therein for a few blocks. When the Burris vehicle was headed down the block where Pittsburgh police officer Gorecki was located, he passed in front of the vehicle and discharged his service weapon into the passenger compartment before and apparently also after it came to a stop from a very close range at the side of the vehicle. (ECF No. 107-1(b); (ECF No. 94-10 at 6, p. 81). 97-10 at 49-65).

Officer Boyko, who was located near the intersection of 13th Street and East Carson Street at the time of the events, did not discharge his weapon at the Burris vehicle, but instead,

discharged his weapon at another vehicle heading towards him that he mistakenly thought was the fleeing vehicle. (ECF No. 115 at ¶ 68; ECF 114-6 at 12-18). Pittsburgh police officers Schweitzer, Matakovich, Kennedy, Gorecki and Boyko discharged their weapons during the incident. (ECF Nos. 49, and 46 at ¶ 23-26; 94-6 at 3). Pittsburgh police officers Schweitzer, Matakovich, Kennedy, and Gorecki discharged their service weapons at the Burris vehicle, (ECF Nos. 49, and 46 at ¶ 23-26), but Pittsburgh police officer Boyko did not. (ECF No. 115 at ¶ 68; ECF 114-6 at 12-18). The Homestead police officers did not discharge their weapons during the incident. (ECF No. 94-10 at 4, p. 71).

As a result of the police discharging their weapons at the Burris vehicle along the four blocks of East Carson Street, passenger Davenport suffered a gunshot wound to the right side of her head in the area of her right eye. (ECF No. 93, 129 ¶ 17; 94-7 at 7, 101 at 13). Paramedics responding to the scene found Davenport lying on the front passenger floor of the Burris vehicle with the single gunshot wound to the right side of her head. (ECF No. 101 at 13). Burris also was shot and found lying over the front driver and rear passenger seats. (ECF No. 101 at 13). Although Burris was charged with numerous offenses, he was only convicted of two (2) counts of Fleeing or Attempting to Elude Officer and one (1) count of Improper Turn/Green Light. (ECF No. 93, 129 ¶ 18; 94-8 at 2-17).

Forensic inspection of the Burris vehicle revealed that bullets hit the vehicle at seven different locations on the outside, including shots fired directly perpendicular to and through the left front passenger door, from behind the rear passenger door on the left side of the vehicle, shots through the driver's side vent window, through the driver's airbag and through the passenger side airbag, shots at the hood of the passenger side of the vehicle, at the middle of the hood of the vehicle, and at the front passenger side bumper of the vehicle. (ECF Nos. 113-1 at 4-23; 115, ¶ 45, 46, 47, 48). One of the bullets shot by the Pittsburgh police officers

entered perpendicularly within inches of the front passenger door handle demonstrating a straight shot to the front passenger compartment directly from the side. (ECF No. 1143-1at 9-10, 13). There were no bullet holes found in the front windshield of the vehicle.

There is no evidence that any pedestrians were injured by the Burris vehicle. The only evidence of a pedestrian injury is that a pedestrian, who was located at about 17th and East Carson Streets, was grazed in her back by a bullet as the Pittsburgh police officers discharged their weapons. (ECF No. 114-1 at 45).

IV.     ANALYSIS

Davenport brings this action pursuant to 42 U.S.C. § 1983, asserting that her substantive due process rights and her right to be free from excessive force and unreasonable seizure were violated as a result of the incidents in the early morning hours of January 13, 2013. Section 1983 is the statutory means for vindicating a violation of federal rights conferred elsewhere and is not itself a source of any substantive constitutional rights. <u>Graham v. Connor</u>, 490 U.S. 386, 393-394 (1989). In an action under § 1983 in which the defense of qualified immunity is raised, such as is raised by the Pittsburgh police officers, the court has discretion, in light of the circumstances of the case to consider in what order it addresses the issue of whether the plaintiff has shown a deprivation of a constitutional right and the issue of whether that right is clearly established. <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009). As recognized in <u>Pearson</u>, the order previously laid down as required in <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), often will be a helpful approach. The court will use that approach here, determining first whether the plaintiff has shown "a deprivation of a constitutional right at all." <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 841 n. 5 (1998); <u>Graham</u>, 490 U.S. at 394. Once the violation of a constitutional right is shown, the court then considering qualified immunity,

which is raised by Pittsburgh Defendants' motion but not by Homestead Defendants, determines whether the constitutional right implicated was clearly established at the time of the alleged violation. Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011).

In order to find Homestead, Pittsburgh or their Police Chiefs liable, there first must be a constitutional injury caused by their officers. City of Los Angeles v. Heller, 475 U.S. 796 (1986). Heller observed for example, that "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that [a policy, custom or practice] might have *authorized* the [constitutionally violation] is quite beside the point." 475 U.S. at 799 (emphasis in original); see also Flanders v. Dzugan, 156 F.Supp.3d 648, 682 (W.D. Pa. 2016) ("[A] predicate constitutional violation must be shown to exist.").

## A. Seizure under the Fourth Amendment

"A person is seized by police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement *intentionally applied*." Brendlin v. California, 551 U.S. 249, 251 (2007) (internal quotations and citations omitted) (emphasis in original); Scott v. Harris, 550 U.S. 372, 381 (2007); Brower v. County of Inyo, 489 U.S. 593, 596-97 (1989). In addition to the driver of a vehicle, a passenger is seized when police make a traffic stop. Brendlin, 551 U.S. at 251 ("We hold that a passenger is seized as well and so may challenge the constitutionality of the stop."). "[A]n unintended person ... [may be] the object of the detention, so long as the detention is "willful" and not merely the consequence of "an unknowing act." 551 U.S. at 255 (internal quotations omitted); see also Berg v. County of Allegheny, 219 F.3d 261 , 271-272 (3d Cir. 2000). There is no doubt that the shooting of Davenport constituted a seizure of her person. Tennessee v. Garner, 471 U.S. 1, 7 (1985); Lamont v. New Jersey, 637 F.3d 177, 183 (3d Cir. 2011). A police pursuit, however, does not

constitute a seizure. <u>Lewis</u>, 523 U.S. at 844 (police pursuit is not itself a seizure and pursuit seeking to stop suspect by show of authority represented by flashing lights and continuing pursuit also not a seizure).

### B. Substantive Due Process Claims against Homestead Defendants

The conduct of the Homestead police officers and the Pittsburgh police officers in this matter is not just a difference of degree of conduct but a difference in kind, pursuit without contact as opposed to the use of deadly force. The court will analyze their conduct separately and chronologically and thus first consider the evidence as to the conduct of the Homestead police officers. Against the Homestead Defendants, Davenport brings only claims for violation of her substantive due process rights because the Homestead officers did not apply any intentional means to seize Davenport or Burris, and did not apply any force in their vehicular pursuit of the driver of the Burris vehicle. Thus, the Homestead officers' conduct does not implicate Fourth Amendment protections.

The United States Supreme Court in <u>Lewis</u> squarely addressed the issue of "whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing [injury of a passenger] through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." 523 U.S. 833 (1998). To that question, the Supreme Court responded "no" and held "that in such circumstances only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a [substantive] due process violation." 523 U.S. at 836.

<u>Lewis</u> involved an action on behalf of the estate of the passenger killed as a result of a police pursuit initiated for a traffic violation. The estate brought sued pursuant to § 1983 for violation of the passenger's substantive due process rights under the Fourteenth Amendment.

14

In <u>Lewis</u>, the officer was faced with a driver of a motorcycle who was operating the motorcycle at a high rate of speed with a passenger on the back.  The officer turned on the patrol car lights, ordered the driver to stop, and pulled his patrol car next to a fellow officer's patrol car in order to pen the motorcycle in.  The driver of the motorcycle refused to pull over, maneuvered it between the two patrol cars, and sped off.  The fellow officer switched on his emergency lights and siren and began to pursue the motorcycle at a high speed through a residential neighborhood.  During the pursuit, the motorcycle wove in and out of oncoming traffic, forced other vehicles off of the road, and reached speeds up to 100 miles an hour with the patrol car following at an extremely close distance considering the rate of speed.  The motorcycle driver attempted a sharp turn but tipped over and the officer in pursuit attempted to stop but was unable to do so due to the speed of his vehicle and how closely he was following the motorcycle.  The officer could not stop his vehicle in time and skidded into the passenger at 40 mph resulting in the passenger being thrown by the impact and the death of the passenger at the scene.

  The Supreme Court instructed in <u>Lewis</u> that the officer

> was faced with a course of lawless behavior for which the police were not to
> blame.  They had done nothing to cause [the pursued driver's] high-speed driving
> in the first place, nothing to excuse his flouting of the commonly understood law
> enforcement authority to control traffic and nothing (beyond a refusal to call off
> the chase) to encourage him to race through traffic at breakneck speed forcing
> other drivers out of their travel lanes.  [The driver's] outrageous behavior was
> practically instantaneous, and so was [the officer's] instinctive response.  While
> prudence would have repressed the reaction, the officer's instinct was to do his
> job as a law enforcement officer, not to induce [the pursued driver's] lawlessness,
> or to terrorize, cause harm or kill.  Prudence, that is, was subject to countervailing
> enforcement considerations, and while [the officer] exaggerated their demands,
> there is no reason to believe that they were tainted by an improper or malicious
> motive on his part.

523 U.S. at 855.

The Supreme Court held in <u>Lewis</u> that even though the officer's conduct was an offense to reasonableness and to a sound code of law enforcement practice, the officer having violated a general order on police pursuits, the officer's behavior did not constitute the conscience shocking behavior required to state a claim for violation of substantive due process. The Supreme Court made clear that the level of conduct required to show a violation of the passenger's substantive due process rights was beyond reckless or even deliberate indifference to the life of the passenger, but rather required a showing of a purposeful intent to harm the passenger unrelated to the legitimate object of arrest, which was not met under the facts. 523 U.S. at 836.

The facts viewed in the light most favorable to Davenport regarding the conduct of the Homestead police officers are that the driver of the vehicle in which she was riding drove through a red light, refused to stop though the Homestead police officers attempted to pull him over, continued to drive without stopping and that the Homestead police officers continued to pursue the driver through Homestead and continuing to the City of Pittsburgh at rates of speed that were not excessive. The Allegheny County 911 dispatch audio provided by Davenport, (ECF No. 107-1(c)), indicates that Officer Strang reported that the Burris vehicle was "not going too fast." Officer Ilgenfritz likewise indicated that it was not a high speed pursuit. (ECF No. 115 ¶ 3). This is not a case where the Homestead officers joined the driver of the vehicle and engaged it in an extremely dangerous high speed chase, but rather one where they continued to follow the vehicle at not high rates of speed as the driver refused to stop.

Davenport tries to suggest that the Homestead police officers somehow forced Burris to continue his flight. (ECF No. 105 at 11). There simply is no evidence in the record to suggest this. More importantly, the Supreme Court has indicated on numerous occasions that the decision to engage in flight and to ignore warnings to stop results, not from pursuit by law

enforcement, but *from the fleeing suspect* intentionally placing himself and others in danger by unlawfully engaging in reckless flight. <u>Lewis</u>, 523 U.S. at 855; <u>Scott</u>, 550 U.S. at 384.

There is nothing to suggest, much less prove, on the part of the Homestead police officers any intent to harm Davenport, much less the required intent to harm Davenport unrelated to the legitimate object of arrest of the driver. The evidence viewed in the light most favorable to Davenport simply does not rise above the high bar to show a purpose by the Homestead officers to cause harm to Davenport unrelated to the legitimate object of arrest of the driver of the vehicle and only a purpose to cause harm unrelated to the legitimate object of arrest will do. Moreover, "under <u>Lewis</u> 'if a police officer is justified in giving chase, that justification insulates the officer from constitutional attack, irrespective of who might be harmed or killed as a consequence of the chase.'" <u>Davis v. Township of Hillside</u>, 190 F.3d 167, 170 n. 2 (3d Cir. 1999) (quoting <u>Onossian v. Block</u>, 175 F.3d 1169, 1171 (1999)); <u>Plumhoff v. Rickard</u>, 134 S.Ct. 2012, 2021 n. 3 (2014) (finding irreconcilable with Supreme Court precedent position that danger presented by chase was caused by officer's decision to continue the chase).

Davenport also assails an alleged failure of the Homestead Officers to follow a Homestead policy on pursuit driving that contains several factors the pursuing officer is to consider. (ECF Nos. 105 at 3; 101 at 16-22). First, the violation by Homestead Officers of the policy is not clear. Second, the violation of the policy is insufficient.

The Homestead pursuit policy pointed to by Davenport provides under "Judgmental Criteria" for officers to evaluate the risks in initiating or continuing a pursuit, and to consider factors that include but are not limited to: 1) road, traffic, and weather; 2) police vehicle type and condition; 3) time of day, visibility and illumination; 4) familiarity with the area; 5) danger to the community if the suspect is not apprehended; 6) location (school, business, or residential

area); 7) likelihood of a successful apprehension; 8) possibility of identification and apprehension at a later time; 9) speed involved; and 10) seriousness of the incident or charges. (ECF No. 101 at 18). The policy also provides that the shift supervisor and the primary and secondary unit in the pursuit have the authority to terminate it. (ECF No. 101 at 20). The policy further provides for termination of the pursuit where the offender can be identified and an arrest made at a later time. (ECF No. 101 at 21). Notably as well the policy provides that "termination of a pursuit does not prohibit the following of a vehicle at a safe speed, or remaining in an area to re-initiate pursuit if the opportunity and conditions permit."

Davenport seeks here to elevate Homestead's policy to a constitutional standard. Lewis and Davis forestall this approach—both involved violations of police regulations or orders and both found those violations to be insufficient. The Court of Appeals for the Third Circuit explained in Davis,

> [i]n *Lewis,* the court of appeals had reversed summary judgment for the defendant officer, finding a triable issue of fact because he had "apparently disregarded the Sacramento County Sheriff's Department's General Order on police pursuits." *Id.* at 1712. The Supreme Court reversed, holding that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment," and that "[t]he fault claimed on [the officer's] part ... fails to meet the shocks-the-conscience test." *Id.* at 1720. *Lewis* thus squarely refutes plaintiff's contention that the officers' violation of police department regulations, which might be probative of recklessness or conscious disregard of plaintiff's safety, suffices to meet the shocks-the-conscience test under the due process clause.

190 F.3d at 170.

Following the instruction of Lewis and Davis v. Township of Hillside, 190 F.3d 167 (1999), even if the conduct of the Homestead police officers in continuing their pursuit of the Burris vehicle to the bar district in Pittsburgh at a time when there would be an increase in pedestrian and vehicle traffic may be characterized as ill-advised and even if it violated "law

enforcement's own code of sound practice," such as violating a policy or general order, viewing the evidence in the light most favorable to Davenport, a reasonable jury could not find their conduct to be "conscience shocking" as required to find that the Homestead Officers violated Davenport's constitutional right to substantive due process.

Lewis and Davis instruct that the asserted violation of policy here is woefully inadequate in the context of substantive due process. Contrary to what Davenport would like, that the pursuit involved here was not a chase at exceedingly or shockingly high speeds, as in Lewis, further counsels against rather than supports any finding that the Homestead officers' conduct "shocks-the-conscience." That the Homestead police officers continued a backed off pursuit, under the circumstances and in the manner they did, backed off and not at high speeds, appeared more ordinary policing rather than "conscience shocking" behavior.

Davis further instructs:

> In *Lewis,* the chase ended when the pursued motorcycle tipped over, throwing Lewis to the pavement where the police car coming to a stop accidentally skidded into him causing his injury. Here, the chase ended when the pursuing police car bumped into the rear of Cook's car, causing him to lose control of the car, which led to the collision in which plaintiff was injured. Plaintiff argues that the deliberate ramming of Cook's car by the police vehicle amounted to use of a deadly weapon, which permits the drawing of an inference that the police acted with the intent to cause physical injury. We disagree. *Lewis* does not permit an inference of intent to harm simply because a chase eventuates in deliberate physical contact causing injury. Rather, it is "conduct intended to injure in some way *unjustifiable by any government interest* [that] is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 1718 (emphasis added).

190 F.3d at 171.

If the conduct in Lewis of chasing in a police cruiser two boys on a motorcycle, for speeding (a traffic violation), continuing through residential neighborhoods at 100 mph and at a following distance of only 100 feet that would not permit the patrol vehicle to stop for over 600 feet with the brakes applied done in violation of police policy and the

conduct in <u>Davis</u> of intentionally ramming a pursued vehicle in violation of a general

order both do not constitute conscience shocking behavior by the pursuing officer, then

Davenport clearly cannot meet the standard here.

> In the words of <u>Davis</u>:

> [h]ere then, as in <u>Lewis,</u> the officers were faced with lawless behavior—the flight
> from their investigation—for which they were not to blame. They had done
> nothing to cause . . . [the] flouting of their law-enforcement authority. [The
> flight] was instantaneous and so, by necessity, was the officers' response. Their
> intent was to do their job as law enforcement officers, not to cause injury. If they
> acted recklessly or imprudently, there is no evidence that their actions were
> tainted by an improper or malicious motive. Because their actions [do] not shock
> the conscience, they [are] entitled to summary judgment.

190 F.3d at 171.

Davenport attempts to argue that the Homestead Police Officers continued their pursuit

despite a direct order to them that they terminate the pursuit. The evidence, however, does not

support the assertion that there was an order to the Homestead police officers that they must

terminate pursuit or that any such order was immediately communicated to the Homestead

police officers.

In January of 2013, the Pittsburgh police and Homestead police did not operate on the

same radio system. (ECF. 94-13 at 4). Allegheny County 911 Emergency Services was

dispatch for Homestead's police radio communications at the time. (ECF No. 100 at ¶ 50). At

about 1:42:01 am on January 13, 2013, two Pittsburgh police officers had indicated to dispatch

that they were joining the pursuit as it was heading inbound towards East Carson Street and

had past Becks Run in route, and that they were going to begin calling the pursuit for

Pittsburgh police officers as the Pittsburgh police officers would not have access to the channel

on which Homestead police officers operated and would be calling the pursuit for benefit of

Homestead officers and dispatch. (ECF No. 94-13 at 5-11).

At some point during the pursuit, Sergeant James E. Perry ("Pittsburgh Sgt. Perry")[4] with the Pittsburgh Police made a decision to terminate the pursuit by any Pittsburgh police officers who had joined it. (ECF Nos. 94-3 at 4-6; 101 at 180-181; 94-13 at 5-11). Pittsburgh Sgt. Perry did not know the reason for the pursuit but made the decision on behalf of the Pittsburgh Police Department to terminate the pursuit by his officers to protect the patrons that would be on the sidewalks and streets at that time. (ECF Nos. 101 at 181).

Pittsburgh police indicated on their radio system that they were terminating their pursuit at 1:42:17 am. (ECF No. 94-13 at 5). At about 1:42:21 am, all City of Pittsburgh units were advised to terminate their pursuit. (ECF No. 94-13 at 26). Subsequently, at about 1:44:05 am, Allegheny County 911 dispatch communicated to the Homestead police officers that the City of Pittsburgh was terminating its pursuit. (ECF No. 94-13 at 6, 8-9). Approximately twenty-four seconds later, at about 1:44:29 am shots were reported fired in the area of 14th Street and East Carson, (ECF Nos. 97-5 at 1; 94-4 at 6), a few blocks further down from where the first shots were fired.

Assistant Chief Gary Thomas, the Allegheny County Director of 911 operations, which was responsible for providing the dispatch communication between Homestead and Pittsburgh explained that in the situation of the pursuit by the Homestead police officers continuing into the City of Pittsburgh that Pittsburgh did not have the authority to call off Homestead's pursuit, and the decision to terminate was the decision of Pittsburgh to terminate Pittsburgh police officers' pursuit and was communicated as such. (ECF No. 94-13 at 6). The pursuing authority, in this case Homestead, has the ability to stop its pursuit. (ECF No. 94-13 at 7). Assistant Chief Thomas further explained that in the situation the City of Pittsburgh does not

---

[4] Homestead's supervisor on duty at the time of the pursuit was Corporal John Sopchak. (ECF No. 107-6 at 5).

have authority over the Borough of Homestead.[5]  Allegheny County 911 dispatch thus advised the Homestead officers that Pittsburgh was terminating its chase--it did not order or communicate an order for the Homestead officers to terminate their chase.  (ECF No. 94-13 at 11).

The decision by Pittsburgh Sgt. Perry that he was terminating Pittsburgh pursuit of the vehicle was neither directly communicated to the Homestead police by Sgt. Perry nor instantaneously communicated to them.  The decision was communicated to the Pittsburgh police and to Allegheny County 911 dispatch instantaneously, and subsequently, over a minute and forty-eight seconds later, Allegheny County 911 dispatch communicated to Homestead police that Pittsburgh had terminated.  (ECF No. 94-13 at 9).  Officer Strang, then the second Homestead police officer in pursuit, appears to acknowledge a communication through dispatch just seconds before the report of shots being fired.  (ECF No. 94-4 at 6).

The testimony of Assistant Chief Gary Thomas regarding the authority of the pursuing Homestead police officers is fully in accord with the law in Pennsylvania.  Section 8953, 42 Pa. Cons. Stat., provides:

§ 8953.  Statewide municipal police jurisdiction

**(a) General rule.--**Any duly employed municipal police officer who is within this Commonwealth, but beyond the territorial limits of his primary jurisdiction, shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office as if enforcing those laws or performing those functions within the territorial limits of his primary jurisdiction in the following cases:

*** 

(2) Where the officer is in hot pursuit of any person for any offense which was committed, or which he has probable cause to believe was committed, within his

---

[5] Indeed, if the City of Pittsburgh had authority over Homestead and its officers, it similarly would have authority over and be responsible for constitutional violations by officers from any other jurisdictions who enter the City of Pittsburgh in pursuit, which is not the case.

primary jurisdiction and for which offense the officer continues in fresh pursuit of the person after the commission of the offense.

\*\*\*

**(c) Relinquishing authority.--**Whenever a municipal police officer exercises any power or authority over any person or event pursuant to the provisions of subsection (a)(3), (4), (5) or (6), the officer shall relinquish authority and control over any such person or event upon the request of the chief law enforcement officer, or a person authorized by him to make the request, of the organized law enforcement agency which regularly provides primary police services in the municipality.

42 Pa. Cons. Stat. § 8953.

Subsection (a)(2) is not enumerated among the situations in which the officer must relinquish authority and control of the event on request from the municipality to which the pursuing authority has travelled. The statutory authority is in harmony with the testimony of Assistant Chief Thomas.

The proposition offered by Davenport that the Homestead police officers at some point were insubordinate and disobeyed a direct order regarding the pursuit is simply inaccurate and contrary to Pennsylvania law. Furthermore, even assuming that Pittsburgh Sgt. Perry was the Homestead police officers' supervisor for the night, which he was not, the communication of Pittsburgh Sgt. Perry's decision to terminate pursuit from the Allegheny County 911 dispatch to the Homestead police officers, given the timing, does not render the Homestead police officer's conduct "conscience shocking." It occurred at or about the same time Pittsburgh police officers were discharging their weapons blocks down the road from the lead Homestead police officer. As recognized in <u>Lewis</u> and <u>Davis</u>, even if the officers would have violated a termination order directed to them at the tail end of their pursuit, that conduct would at most support a reckless disregard which would be insufficient, and here, would not have not altered the outcome as to the conduct of the Pittsburgh police officers in shooting at the Burris vehicle.

Scott, as did Lewis and Davis, all involved pursuit initiated for a traffic violation as was

done here. In Scott what ended in a ten mile pursuit, twice the distance of the pursuit here,

began with a deputy attempting to pull over the driver of the speeding vehicle, and when the

driver refused to pull over an ensuing chase. Another deputy joined the pursuit after hearing

radio communication regarding the chase. The fleeing vehicle raced "down narrow, two-lane

roads in the dead of the night at speeds that [were] shockingly fast." 550 U.S. at 379. It

swerved around cars and crossed the double-yellow line, which in turn forced cars to the

shoulder to avoid being hit. The fleeing vehicle ran through multiple red lights chased by

numerous police cars. Six minutes and ten miles into the chase, the officer attempted to

terminate the episode by bumping into the rear of the fleeing driver's vehicle to cause a spin

and stop of the fleeing vehicle. At the time "when [the officer] rammed [the fleeing driver's]

vehicle it was not threatening any other vehicle or pedestrians." 550 U.S. at 380, n.7. Instead

of a spin and stop, the bump by the patrol car caused the fleeing driver's vehicle to leave the

roadway, run down an embankment, overturn and crash, rendering the driver a quadriplegic.

Although Scott involved the use by the officer of a bump procedure to stop the fleeing vehicle,

which rendered it a Fourth Amendment case, and this case involved no contact by the

Homestead police officers, it is instructive because the Supreme Court found the officer's

conduct in Scott reasonable even though he employed a dangerous driving procedure.

Davenport suggests that "if only" the Homestead police officers had stopped pursuit

none of the incidents occurring in the bar district would have taken place. The Supreme Court

squarely addressed that very same question in Scott, *albeit* in the context of its Fourth

Amendment analysis as follows:

> But wait, says respondent: Couldn't the innocent public equally have been
> protected, and the tragic accident entirely avoided, if the police had simply ceased
> their pursuit? . . . First, of all, there would have been no way to convey

convincingly to respondent that the chase was off and he was free to go. Had respondent looked in his rearview mirror and seen the police cars deactivate their flashing lights and turn around, he would have had no idea whether they were truly letting him get away, or simply devising a new strategy for capture. Perhaps the police knew a shortcut he didn't know, and would reappear down the road to intercept him; or perhaps they were setting up a roadblock in his path. Given such uncertainty, respondent might have been just as likely to respond by continuing to drive recklessly as by slowing down and wiping his brow.

550 U.S. at 385.

The Supreme Court further announced in Scott that it is

loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive *so recklessly* that they put other people's lives in danger. It is obvious the perverse incentives such a rule would create: Every fleeing motorist would know that escape is within his grasp, if only he accelerates to 90 miles per hour, crosses the double-yellow line a few times, and runs a few red lights. The Constitution assuredly does not impose this invitation to impunity-earned by recklessness.

550 U.S. at 385-386 (emphasis in original).

It would be even more perverse to lay down a rule here, *requiring* the police to allow every fleeing suspect to flout authority so long as the suspect avoids excessively high speeds and can drive to "safe harbor" in residential neighborhoods, school zones or even bar districts at closing time. This would not only encourage such flight it would place a direct target on the place where reckless driving might cause the most harm to the public—a rather ill-advised approach to be sure and one the Supreme Court advises against.

Davenport points out that the Homestead police officer Strang had called in the license plate, arguing that they should have discontinued pursuit and just used that information later for an arrest. There is no evidence in the record that the police officers had identified Burris as the driver and in Scott, like here, the pursuing officer had called

in the license plate of the traffic violator, yet continued pursuit. 550 U.S. at 375. This evidence is not suggestive of the required intent to harm Davenport.

Based on the controlling authority, there is insufficient evidence from which a reasonable jury could find that the Homestead police officers' actions "shock the conscience" and violated Davenport's substantive due process rights. Accordingly, summary judgment will be entered in favor of the Homestead police officers on the sole claim against them for violation of Davenport's substantive due process rights under the Fourteenth Amendment in the first cause of action.

As a constitutional violation by the Homestead Officers is required to find the Borough of Homestead and its Police Chief liable under § 1983 for a violation of Davenport's substantive due process rights by the Homestead police officers, Heller, 475 U.S. at 799; Flanders, 156 F.Supp.3d at 682, the Borough of Homestead and Chief Desimone are entitled to summary judgment in their favor on the sole claim against them for violation of substantive due process under the second cause of action. Necessarily then, Davenport is not entitled to summary judgment in her favor on her claims against the Borough of Homestead, and her motion for summary judgment will be denied. The court now turns to the claims against the Pittsburgh Defendants.

### C. Davenport's claims against Pittsburgh Defendants for excessive force and for violation of substantive due process

Davenport sues the Pittsburgh Defendants for violation of her substantive due process rights and her Fourth Amendment right to be free from excessive force. Where the claim brought under § 1983 is one of excessive force, "the validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to

some generalized 'excessive force' standard." <u>Graham</u>, 490 U.S. at 394.  Moreover, <u>Graham</u>

held that

> *all* claims that law enforcement officers have used excessive force—deadly or
> not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen
> should be analyzed under the Fourth Amendment and its 'reasonableness'
> standard, rather than under a 'substantive due process' approach.  Because the
> Fourth Amendment provides an explicit textual source of constitutional protection
> against this sort of physically intrusive governmental conduct, that Amendment,
> not the more generalized notion of 'substantive due process,' must be the guide
> for analyzing these claims.

490 U.S. at 395.  Thus, when faced with a case such as this, presenting claims for both

violation of substantive due process and claiming excessive force, the court generally must

determine which route of analysis to follow.

The question regarding seizure by the Pittsburgh Defendants becomes whether the

means were  intentionally applied.  The Pittsburgh Defendants assert that the Pittsburgh police

officers did not know that there was a passenger in the vehicle, and shot at the driver, and thus

the means were not intentionally applied.  Davenport asserts that the Pittsburgh police officers

did know that there was a passenger and in support of her assertion offered sufficient evidence

from which a reasonable jury could find that the Pittsburgh police officers did in fact know

there was a passenger—the observation by others of a passenger though located further from

the vehicle than the Pittsburgh police officers, the location of the Pittsburgh police officers at

the time they discharged their weapons as supported by forensic evidence and video, and the

visibility in the location  in a similar position.  As she was shot, there can be no doubt that she

was seized at some point and that the Fourth Amendment applies to some if not all of her case

against the Pittsburgh Defendants.  This case presents a unique situation where the court is

convinced Davenport's case potentially is capable of proceeding against the Pittsburgh

Defendants under both substantive due process and and Fourth Amendment approaches.

> For example, if a police officer fires his gun at a fleeing robbery suspect and the
> bullet inadvertently strikes an innocent bystander, there has been no Fourth
> Amendment seizure. *See Medeiros,* 150 F.3d at 168–69; *Rucker,* 946 F.2d at 281;
> *Landol–Rivera,* 906 F.2d at 795. If, on the other hand, the officer fires his gun
> directly at the innocent bystander in the mistaken belief that the bystander is the
> robber, then a Fourth Amendment seizure has occurred. *See Brower,* 489 U.S. at
> 596, 109 S.Ct. 1378 (citing *Hill v. California,* 401 U.S. 797, 802–05, 91 S.Ct.
> 1106, 28 L.Ed.2d 484 (1971)).

Berg, 219 F.3d at 269. Here, however, the factual scenario presented by Davenport and

supported by differing possible views of the evidence, positions this case somewhere between

these two scenarios—almost as if the officer fired his gun directly at the innocent bystander

who is standing next to the robber.

The Supreme Court in Plumhoff as well has recognized the lower courts have taken

differing approaches as to whether the case brought by a passenger such as Davenport must be

brought as a substantive due process case or one for excessive force under the Fourth

Amendment. 134 S.Ct. at 2022 n. 4; see Vaughan v. Cox, 343 F.3d 1323 (11th Cir.

2003)(analyzing case under both approaches); see also Grazier ex rel. White v. City of

Philadelphia, 328 F.3d 120 (3d Cir. 2003) (involving suit by passenger where matter went to

jury on both claims, 2001 WL 1168093 (E.D. Pa. July 25, 2001), though appeal only involved

Fourth Amendment claim). Plumhoff did not address whether the passenger in that case, who

died as a result of a combination of gun-shot wounds inflicted when the police shot at the

vehicle she was in and the injuries she suffered when the car eventually crashed, 134 S.Ct. at

2018, could recover for violation of their Fourth Amendment rights because Plumhoff only

involved the claim of the suspect-driver. 124 S.Ct. at 2022.

The governing analysis here appears to depend in part on an issue of fact regarding the

knowledge of the Pittsburgh police officers regarding the presence of Davenport in the vehicle

and whether they shot at her intentionally. Where in Lewis, although the presence of the

plaintiff on the back of the motorcycle was known, the officer did not intentionally run into

him by employing a means to stop the pursuit, such as by ramming the vehicle or shooting at it.

Thus, it would appear in the event that the Pittsburgh police officers either did not know of

Davenport's presence or did not intentionally shoot at or about her as she was a passenger, the

case is capable of analysis under substantive due process because the means to terminate her

freedom of movement may not be said to be intentionally applied as required under the Fourth

Amendment. Where, however, the Pittsburgh police officers did know of her presence and did

shoot at or about her anyway, the case appears governed by the more explicit provisions of the

Fourth Amendment and its prohibition on excessive force. With that understanding, analysis

will proceed under both scenarios.

Considering that Davenport's case against the Pittsburgh Defendants can be analyzed

under either a Fourth Amendment analysis or as a violation of substantive due process, the

court will first "slosh [its] way through the factbound morass of 'reasonableness[,]'" Scott,

550 U.S. at 383, in analyzing her claims against the Pittsburgh Defendants under Fourth

Amendment jurisprudence. The court is mindful also that in ruling on summary judgment in a

case where the use of deadly force has rendered Davenport unable to testify to the events in

question, it must be cautious

> to ensure that the officers are not taking advantage of [her inability to testify] . . .
> and avoid simply accepting what may be a selfserving account by the officers. It
> must also look at the circumstantial evidence that, if believed, would tend to
> discredit the police officers' story, and consider whether the evidenced could
> convince a rational fact finder that the officers acted unreasonably.

Lamont, 637 F.3d at 182 (internal quotations and citations omitted) (case involving death);

Abraham v. Raso, 183 F.3d 279, 294 (3d Cir. 1999). There is, however, no more rigorous a

standard for summary judgment applied in deadly-force cases. 637 F.3d at 182.

### 1. Excessive Force in Violation of the Fourth Amendment

The claims against the Pittsburgh Defendants are that the Pittsburgh police officers shot at her and also shot at her in the Burris vehicle as they were attempting to stop the Burris vehicle in which she was a passenger. "[A] claim of 'excessive force in the course of making [a] . . . 'seizure' of [the] person [is] properly analyzed under the Fourth Amendment's 'objective reasonabless' standard.'" Scott, 550 U.S. at 381 (quoting Graham v. Connor, 490 U.S. 386, 388 (1989)). See Grazier, 328 F.3d 120 (involving claim by both the driver and the passenger alleging violation of right to be free from excessive force where officers shot at plaintiffs in the course of a traffic stop, shot driver and passenger was showered in broken glass). "There can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Garner, 471 U.S. at 7.

"To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that is was unreasonable." Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999). "Use of excessive force by a law enforcement officer is considered [itself] a 'seizure' under the Fourth Amendment, which prohibits such unlawful action." Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2004).

 Graham instructs that:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, nor by the mistaken execution of a valid search warrant on the wrong premises. With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

Graham, 490 U.S. at 396-397 (internal citations and quotations omitted).

The question here then becomes whether the Pittsburgh officers' actions are objectively reasonable in light of the facts and circumstances. "Reasonableness depends on not only when a seizure is made, but also *how* it is carried out." Garner, 471 U.S. at 8 (emphasis added). The nature and quality of the intrusion is balanced against the importance of the governmental interest urged to justify the intrusion in order to determine whether the officer's action was objectively reasonble. 471 U.S. at 8. In so balancing, the court is to consider factors such as the severity of the crime at issue, the threat to the safety of officers or others, and whether an individual is actively resisting arrest or evading arrest by flight. Graham, 490 U.S. at 396. For example, with this balancing, an officer's use of deadly force to apprehend a suspect fleeing on foot who appeared unarmed and not otherwise dangerous violates the suspect's constitutional rights despite the officer having probable cause to arrest. Graham, 490 U.S. at 394 (citing

Garner, 471 U.S. 1). "The intrusiveness of a seizure by means of deadly force[, however,] is unmatched," Garner, 471 U.S. at 9, and weighs heavily in the calculus.

Pittsburgh Defendants argue that Davenport cannot show that the Pittsburgh police officers used excessive force because a) the Pittsburgh police officers acted reasonably in light of the circumstances and b) the Pittsburgh police officers were unaware of Davenport's presence and owed her no duty of care. (ECF No. 96 at 3). Thus, the Pittsburgh Defendants contend that the Pittsburgh police officers "acted in accordance with the standards for the use of deadly force against a vehicle that presents substantial risk of injury or death to innocent bystanders during a chase and they attempted to eliminate the threat to innocent bystanders." (ECF No. 96 at 9). It bears stating that deadly force is not used against a vehicle but against human beings, though perhaps aimed at the vehicle in which they are travelling.

As to the knowledge of Davenport's presence and location in the vehicle, there is evidence in the record from which a reasonable jury could find that the officers did in fact know of her presence. There also are genuine issues of material fact as to where the officers were in relation to the vehicle as it travelled down East Carson Street, and the extent of pedestrian traffic and its location relative to the vehicle as well. As to whether the actions of Pittsburgh police officers Schweitzer, Matakovich, Kennedy, and Gorecki were objectively reasonable under the circumstances, there is evidence from which a reasonable jury could find that these officers shot directly at Davenport or at the passenger side of the vehicle knowing she was present in the vehicle and not the driver of it, shot through the passenger compartment, shot at the vehicle despite that it was not involved in a high speed chase, shot when the officer and others were located in a place of relative safety, and shot even after the vehicle was stopped.

In Abraham v. Raso, 183 F.3d 279, 294-295 (3d Cir. 1999), the Court of Appeals for the Third Circuit observed that if there is evidence from which a reasonable jury could find that an officer shot at a fleeing suspect when out of harm's way, the jury also could find that the conduct of that individual was not so dangerous as to warrant the use of deadly force. Even "[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." Ellis v. Wynalda, 999 F.2d 243, 247 (7th Cir. 1993). As aptly put by Davenport, a "passing danger to a police officer is not an ongoing license to shoot after the threat has passed." ECF No. 111 at 16 (citing Ellis and Abraham).

Quizzically, the Pittsburgh Defendants also vehemently contend that Davenport's claims fail because she cannot show that any "excessive force was used against her after the vehicle was stopped." (ECF No. 96 at 7). Yet both the Pittsburgh Defendants and Davenport rely on the very same video to make their case. Pittsburgh Defendants point to the dash cam video from the Classy Cab and assert that it shows that Officer Gorecki shot at the Burris vehicle only when it continued to drive at him after rear-ending an SUV and before it came to its eventual rest against the Classy Cab. On the court's review of the video, a reasonable jury might not agree. The video appears to show Officer Gorecki crossing the street in front of the Burris vehicle before the Burris vehicle hit another vehicle and then him turning and shooting at the Burris vehicle at point blank range as it was starting to drive by him and possibly could be seen, as urged by Davenport, to also show him shooting after it had come to a stop against the Classy Cab. (ECF No. 107-1(b)). The video also appears to show that the Burris vehicle was not coming at Officer Gorecki as he shot through the passenger compartment. Thus, contrary to the Pittsburgh Defendants' assertions, Davenport indeed has evidence from which a jury could find deadly force being used against her after the vehicle was stopped. But, the jury could also find from the evidence that the shots were fired from the side and through the

33

passenger compartment that the conduct of the Pittsburgh police officers was objectively unreasonable towards Davenport under the totality of the circumstances.

Scott indicates that in determining whether the plaintiff can show a violation of her right to be free from excessive force in the officer's conduct in effecting a seizure to stop a fleeing vehicle, the court should take into account the risk the officer's conduct posed to the plaintiff, the threat to the lives of pedestrians present, other civilian motorists, and to the officers involved. 550 U.S. at 372. Additionally, the relative culpability of the parties is to be considered. Here, most notably, Davenport is not the culpable party.[6]

The conduct of Pittsburgh police officers in discharging their weapons into the passenger compartment of the vehicle can be said to pose not just a "high likelihood of serious injury or death" as the deployment of the vehicle bump procedure in Scott but rather "the near certainty of death posed by, say, shooting a fleeing felon in the back of the head, or pulling alongside a fleeing motorist's car and shooting the motorist." 550 U.S. at 384. The conduct of the Pittsburgh police officers in discharging their weapons into the passenger compartment is precisely like the latter scenario described by Scott. More importantly, as with the use of deadly force, the consideration of "relative culpability" weighs heavily in the determination of objective reasonableness of the actions by the Pittsburgh police officers where Davenport is not the culpable party for the flight—because Burris was the driver and Davenport was not a "fleeing suspect."

While Pittsburgh Defendants apparently contend that there were thousands upon thousands of hapless individuals spilling into the streets and threatened by the pursued vehicle,

---

[6] Defendants attempt to insinuate that Davenport is somehow the responsible party for the flight and continued chase, (ECF Nos. 92 at 3; 96 at 5), however, the court flatly rejects this approach under Lewis and Davis.

and the video from the Classy Cab does depict some pedestrians in the area, it does not depict the numbers of pedestrians portrayed by the Pittsburgh Defendants and the extent of the danger claimed by Pittsburgh Defendants—such that a reasonable jury could not find otherwise. Similarly, there is evidence that Burris did not drive his vehicle at pedestrians.  (ECF No. 97-2 at 10).

Pittsburgh Defendants argue specifically and only as to Officer Boyko that he is entitled for summary judgment for the reason that there is no evidence that he shot at the Burris vehicle.  The evidence established that Officer Boyko did not discharge his firearm at the Burris vehicle, but rather discharged his firearm at a different vehicle that he mistook for the pursued vehicle.  In Davenport's brief in opposition to the Pittsburgh Defendants' motion, Davenport only cites Pittsburgh police officer Boyko's conduct as to the vehicle he mistook for the Burris vehicle.  (ECF No. 111 at 7).  Davenport cannot assert the rights of another nor seek recovery for the possible violation of another's rights. Plumhoff, 134 S.Ct. at 2022.  On this record, a reasonable jury could not find that Officer Boyko used any force on Davenport or the Burris vehicle, and therefore, he is entitled to summary judgment on all of the claims against him under § 1983, including the state law claims addressed *infra*.

Where there are issues of fact bearing on the reasonableness of the officers' actions, summary judgment is inappropriate. See Barton v. Curtis, 497 F.3d 331, 335 (3d Cir. 2007) ("[I]f there are facts material to the determination of reasonableness in dispute, then that issue of fact should be decided by the jury.").  Under the circumstances of this case, there are numerous fact issues for a jury to resolve that bear on the ultimate determination of the objective reasonableness of the Pittsburgh police officers' actions.  A reasonable jury could find that the actions of Pittsburgh police officers Schweitzer, Matakovich, Kennedy, and Gorecki in using deadly force against Davenport were objectively unreasonable under the

circumstances, and thus, that her Fourth Amendment right to be free from excessive force was violated. Accordingly, summary judgment in favor of Pittsburgh police officers Schweitzer, Matakovich, Kennedy, and Gorecki for violation of Davenport's Fourth Amendment right to be free from excessive force is inappropriate.

### 2. Violation of Substantive Due Process

As urged by Davenport, a reasonable jury also could find that Pittsburgh police officers Schweitzer, Matakovich, Kennedy, and Gorecki fired indiscriminately into the passenger compartment with a purpose to harm. Contrary to its determination regarding the conduct of the Homestead police officers, the court has little difficulty, under the view presented by Davenport in considering the evidence in the light most favorable to Davenport, that the conduct of these officers "shocks the conscience." Unlike the pursuit by the Homestead police officers, the conduct of the Pittsburgh police officers in readily discharging their weapons into the passenger compartment and from the side of the Burris vehicle as it passed by them and from a position of safety could show the arbitrary conduct with a purpose to harm unrelated to the legitimate object of arrest, which is sufficient to shock the conscience as required by Lewis. On this record, viewed in the light most favorable to Davenport, a reasonably jury could find that these Pittsburgh police officers violated Davenport's substantive due process rights. Accordingly, Davenport also may proceed on her claim for violation of her substantive due process rights by Officers Schweitzer, Matakovich, Kennedy, and Gorecki.

### 3. Qualified Immunity

The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies

36

regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.

Pearson, 555 U.S. at 231.

The Pittsburgh Defendants argue that the Pittsburgh police officers are entitled to qualified immunity because according to them, Davenport has not shown that they violated a clearly defined right under the applicable and controlling case law at the time of the incident. (ECF No. 96 at 11-12).   They also assert that the question of whether they are entitled to qualified immunity is a question of law for the court.  (ECF No. 96 at 11).  There are cases, however, where an issue of fact will prevent the qualified immunity question from being answered as a matter of law, such as where, as here, the conduct of the officers is fairly in dispute.  Plumhoff, 134 S.Ct. at 2019 ("an order denying summary judgment on qualified immunity based on a determination of "evidence sufficiency" does not present a legal question" permitting immediate appeal such as where there is dispute as to whether certain officers were present or not during an alleged beating); Zion v. Nassan, 556 F. App'x 103, 107 (3d Cir. 2014).

Plumhoff instructs that:

[a]n official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was "clearly established" at the time of the challenged conduct.  And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.  In other words, existing precedent must have placed the statutory or constitutional question confronted by the official "beyond debate."  In addition, we have repeatedly told courts not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.

Plumhoff, 134 S.Ct. at 2023 (internal quotations and citations omitted).

_Garner_, 471 U.S. 1, 11 (1985), a 1985 case, holds generally that the unreasonable use of deadly force as a means of seizure violates Fourth Amendment constitutional rights. The Supreme Court recognized that _Garner_ and _Graham_ previously established general propositions regarding constitutional rights, and that the general holding of those cases does not suffice as the clearly established rights of which a reasonable person would have known. _Plumhoff_, 134 S.Ct. at 2023. Nevertheless, _Garner_ further specifically and bluntly instructs that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." 471 U.S. at 11. _A fortiari_, _Garner_ establishes further that a police officer may not seize an unarmed non-dangerous passenger by shooting her dead. That presents a rather obvious case.

Pittsburgh Defendants misread _Plumhoff_ and assert that because it was decided after the events in question in the case _sub judice_, and held that no case law existed at the time of that 2014 decision putting defendant officers "on notice that the use of deadly force under the present circumstances was unreasonable," (ECF No. 96 at 12), it dictates that defendant officers are entitled to qualified immunity. _Plumhoff_ clarifies, however, that "_Brosseau_ makes plain that as of February 21, 1999—the date of the events at issue in that case—it was not clearly established that it was unconstitutional to shoot a fleeing driver to protect those whom his flight might endanger." _Plumhoff_, 134 S. Ct. at 2023. Specifically, _Plumhoff_ determined that three officers in discharging their weapons 15 times into the fleeing suspect's vehicle to stop a _dangerous high speed chase_ did not violate the fleeing suspect's right to be free from excessive force. It observed that in _Plumhoff_ as in _Scott_ the fleeing suspect's "outrageously reckless driving posed a _grave_ public safety risk." 134 S.Ct. at 2021 (emphasis added). The Court further indicated in _Plumhoff_ that to defeat qualified immunity, the plaintiff needed to show that the case was either materially different from the facts in _Brosseau_ or that between February 21, 1999 (the date _Brosseau_ was decided) and July 18, 2004 (the date of the

38

events in question), there was either controlling authority or a consensus of persuasive authority establishing the contours of the right. 134 S.Ct. at 2023. It should be noted as well that Plumhoff was a case on appeal from the Sixth Circuit.

Where, as here, a reasonable view of the evidence would support that Pittsburgh police officers intentionally and indiscriminately shot at a person who was not the fleeing suspect but rather a passenger, knowing their weapons were being discharged at close range towards her, the qualified immunity analysis is not forestalled by lack of a case with the same or similar facts. "Of course, in an obvious case, [constitutional] standards can 'clearly establish' the answer, even without a body of relevant case law." Brosseau v. Haugen, 543 U.S. 194 (2004). Thus, a materially similar case is not always required for the right to be clearly established. Hope v. Pelzer, 536 U.S. 730, 738 (2002). A reasonable officer at the time of these incidents would have known and had fair warning that their conduct in firing upon Davenport at the time it occurred violated either her Fourth Amendment rights, her substantive due process rights, or both. Accordingly, this court sees neither Plumhoff nor qualified immunity as an obstacle in the Third Circuit regarding Davenport taking her case against the Pittsburgh police officers to a jury.

Plumhoff involved the case brought against the police regarding the injury and death to the fleeing driver when the police fired several shots at the vehicle. The Court in Plumhoff reiterated that Fourth Amendment rights are personal rights that may not be vicariously asserted, and that in a case brought by a passenger in a fleeing vehicle subjected to gunfire deployed to stop the fleeing vehicle the risk to the passenger would be of "central concern." 134 S.Ct. at 2022. One of the problems with the Pittsburgh police officers' position on qualified immunity is that it ignores the evidence from which a reasonable jury could find that

39

they intentionally shot at her—the passenger—or at least knew of her presence in the vehicle and shot at or about her anyway.

The facts presented by Davenport are materially different from the facts in <u>Brosseau</u> as Davenport was not a fleeing suspect. Here, the concern for Davenport and her safety is a primary concern as she was not the suspect and she is the one suing for violation of her rights. This case presents one where the obviousness of the constitutional violation under the scenario of events posited and supported by Davenport does not require a body of factually similar caselaw to put the officers on fair notice that there conduct would violate clearly established principles. Thus, Pittsburgh Defendants' reliance on <u>Plumhoff</u> does not rule the day.

<u>Zion</u>, 556 F. App'x 103, determined that the clearly established law in the Third Circuit since <u>Abraham</u> decided in 1999 and reaffirmed in 2011 in <u>Lamont</u>, 637 F.3d at 184, provides that a "passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect." As <u>Zion</u> aptly puts it the clearly established law at the time of the incidents in <u>Zion</u>, which occurred in 2009, established that it would be "unreasonable to shoot directly at a driver [and also therefore the passenger] who is coming toward an officer when the officer has the opportunity to move out of the way." 556 F. App'x at 109.

The further difficulty with the Pittsburgh police officers' position on qualified immunity is the truism that constitutional rights are personal and may not be vindicated vicariously by the assertion of another. <u>Plumhoff</u>, 134 S.Ct. at 2022. The Supreme Court specifically rejected the approach urged by the plaintiff in <u>Plumhoff</u>, who was the fleeing suspect driver, that would consider the presence of a passenger in the front passenger seat in determining whether the officer's conduct in shooting at the fleeing driver was reasonable or violated the driver's right to be free from the use of excessive force. Here, much of the argument by Pittsburgh Defendants is aimed towards the conduct of the driver rather than

considering whether a reasonable officer would know that his conduct towards <u>Davenport</u> violated her right to be free from excessive force.

The court finds it beyond purview, whether judged on January 13, 2013 or decades prior, that if the officer's intentionally shot at or towards Davenport knowing of her presence in the direct line of their fire and did so from a point of safety, which a reasonable jury could find based on the evidence viewed in the light most favorable to her, a reasonable officer would know that the conduct violated her right to be free from excessive force, and quite frankly, also would know that the conduct was so "brutal and offensive" as to "shock the conscience" and not comport with the "concept of ordered liberty" and traditional notions of "fair play and decency," thus violating her substantive due process rights. <u>Lewis</u>, 523 U.S. at 846-847 (citing <u>Breithahput v. Abram</u>, 352 U.S. 432, 435 (1957).

Put quite bluntly, while an officer may be justified in using deadly force to stop a non-violent suspect fleeing by vehicle who poses an immediate threat of serious or grave harm to the police officer or others, an officer may not intentionally use that same deadly force against a passenger in that vehicle. The scenario presented here, viewing the evidence in the light most favorable to Davenport, including the disputed evidence regarding her known presence and the apparent danger posed by the fleeing vehicle, presenting issues of fact, is one in the words of <u>Brosseau</u> and <u>Hope</u> that the clearly established standards provide the answer even without a body of relevant case law or a materially similar case required to clearly establish the right violated. Accordingly, Pittsburgh Defendants' motion for summary judgment on qualified immunity grounds will be denied.

### 4. Section 1983 Claims Against the City of Pittsburgh and Chief Harper

Davenport sues Chief Harper in his official capacity for the very same claims she brings against the City of Pittsburgh. Citing, <u>Ford v. City of Pittsburgh</u>, Civ. Act. No. 13-1364,

2014 WL 7338758 (W.D. Pa. Dec. 22, 2014), Pittsburgh Defendants argue that the claims

against Chief Harper should be dismissed as duplicative.  As pointed out in Ford, "[o]fficial

capacity claims against state and local officials, are, essentially, another way of proceeding

against a municipality." 2014 WL 7338758, at * 5.   The claim against Chief Harper

> "generally represent[s] only another way of pleading an action against an entity of
> which an officer is an agent." *Monell v. New York City Dept. of Social Services,*
> 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035, n. 55, 56 L.Ed.2d 611 1978). As
> long as the government entity receives notice and an opportunity to respond, an
> official-capacity suit is, in all respects other than name, to be treated as a suit
> against the entity. *Brandon, supra,* 469 U.S., at 471–472, 105 S.Ct., at 878. It is
> *not* a suit against the official personally, for the real party in interest is the entity.

Kentucky v. Graham, 473 U.S. 159, 166 (1985).  Accordingly, summary judgment is

appropriate in favor of Chief Harper on the Fourth and Sixth causes of action as duplicative of

the suit against the City of Pittsburgh.  Blair v. City of Pittsburgh, Civ. Act. No. 14-1473, 2015

WL 4162400 (W.D. Pa. July 9, 2015); Ford, 2014 WL 7338758; Thomas v. City of Chester,

2016 WL 1106900, at * 2 (E.D. Pa. March 21, 2016)(citing Moore v. City of Philadelphia, Civ.

Act. No. 14-133, 2014 WL 859322 at *3 (E.D. Pa. March 5, 2014)(dismissing claims as

redundant based on court's inherent authority to "achieve the orderly and expeditious

disposition of cases")); see also Fed.R.Civ. P. 1.

> Under Monell v. Dep't of Soc. Serv. Of City of New York, 436 U.S. 658, 694 (1978),
>
> a local government may not be sued under § 1983 for an injury inflicted solely by
> its employees or agents. Instead, it is when execution of a government's policy or
> custom, whether made by its lawmakers or by those whose edicts or acts may
> fairly be said to represent official policy, inflicts the injury that the government as
> an entity is responsible under § 1983.

436 U.S. at 694.  Monell unquestionably involved official policy as the moving force of

the constitutional violation as it involved official policy requiring the unconstitutional

result.  436 U.S. at 694 (discriminatory policy requiring pregnant employees to take

unpaid leave before leave was required for medical reasons).

42

Pittsburgh Defendants argue that Davenport cannot point to any policy of Pittsburgh that constitutes a substantial nexus between the challenged conduct and her injury. Davenport responds that she seeks to hold Pittsburgh liable under a "failure to train" theory, stating in her brief in opposition to the Pittsburgh Defendants' motion for summary judgment that "[t]he Plaintiff claims that Defendant, [t]he City of Pittsburgh, was deliberately indifferent to its obligation to train its officers in its policies to safeguard innocent persons against the use of excessive force in the discharge of firearms in circumstances involving vehicular pursuits which their officers might encounter prior to the pursuit which these officers encountered on January 13, 2013." (ECF No. 111 at 6).

The United States Supreme Court held in City of Canton, Ohio v. Harris, 489 U.S. 378 (1989), "that the inadequacy of police training may serve as the basis for liability under § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, 489 U.S. at 388. Municipal liability for failure to train is narrow. Brown v. Muhlenberg Twp., 269 F.3d 2015, 215 (3d Cir. 2001). In order to find liability under Monell on a failure to train theory, the "City's failure to train its police officers must reflect a deliberate or conscious choice by policymaking officials, such that one could call it the City's policy or custom." Grazier ex rel. White v. City of Philadelphia, 328 F.3d 120, 124 (3d Cir. 2003). That failure must have inflicted the injury. 436 U.S. at 694.

In the absence of a defined policy, custom or practice that can be said to have caused the constitutional harm, a plaintiff may show the municipality's failure to adequately train caused the constitutional harm, which Davenport attempts to do here.

> Establishing municipal liability on a failure to train claim under § 1983 is
> difficult. A plaintiff pressing a § 1983 claim must identify a failure to provide
> specific training that has a causal nexus with their injuries and must demonstrate

that the absence of that specific training can reasonably be said to reflect a
deliberate indifference to whether the alleged constitutional deprivations
occurred.

Reitz v. County of Bucks, 125 F.3d 139, 145 (3d Cir. 1997).

It is not sufficient to show merely that the injury could have been avoided with more or

better training.  City of Canton, 489 U.S. at 391.  "[A]dequately trained officers occasionally

make mistakes; the fact that they do says little about the training program or the legal basis for

holding the city liable."  489 U.S. at 391.   "While claims such as [Davenport's]—alleging that

the city's failure to provide training to [its police officers] resulted in the constitutional

deprivation she suffered—are cognizable under § 1983, they can only yield liability against a

municipality where that city's failure to train reflects deliberate indifference to the

constitutional rights of its inhabitants." 489 U.S. at 392.

Pittsburgh Defendants argue that Davenport relies on dissimilar instances to show that

the City knew the training was necessary yet failed to provide it.  (ECF No. 96 at 17).

Specifically, referring to Zion, 556 F. App'x 103, involving the police shooting at a vehicle in

the City of Pittsburgh, they argue that Davenport relies on "a case in which police officers

dispensed their weapons into a suspect's car only after the suspect had stopped evading their

pursuit, which is clearly distinguishable from the situation involving Plaintiff."  (ECF No. 96 at

17).  The court, on review of the Classy Cab video, however, begs to differ.  A reasonable jury

on review of that video could find precisely what Pittsburgh Defendants describe as

"distinguishable," a Pittsburgh police officer discharging his weapon from the side after the

vehicle had been stopped.

Davenport adduced evidence by way of deposition of Officer Matakovich that in

twenty years he had never received training regarding the use of firearms in the situation

of a moving vehicle and that he could not recall those issues being addressed in training.

44

(ECF No. 112-2 at 11, 85-86).  Davenport points to evidence that officers were not

trained regarding the discharge of firearms at a moving vehicle, although the City of

Pittsburgh had promulgated in 2000 a written policy regarding the discharge of firearms

at a moving vehicle.

> That policy provided that
>
> an officer shall not discharge his/her firearm at a moving vehicle or the occupants
> unless the occupants are using deadly physical force against the officer or another
> person present by means other than the vehicle.  The only exception to said policy
> is a situation where a vehicle is being intentionally operated as a weapon and an
> officer, or a third party, is faced with immediate death or serious bodily injury and
> the officer has done everything reasonably necessary to avoid the use of deadly
> force.

(ECF Nos. 114-1 at 56; 111 at 6).  It further provided that it was "to be read at roll call for five

consecutive days and to be placed on a read board in every duty location for one year."  (ECF

Nos. 114-1 at 56).  It also provides that the policy should be issued to concur with training

prohibiting shooting at moving vehicles due at that time to incidents in other cities. (ECF Nos.

114-1 at 56).  Yet Pittsburgh police officer Matakovich, a 20 year member of the force,

testified that he was not aware of any such training.

> [T]he Supreme Court has held that *Monell* liability may flow from a
> municipality's lack of a policy and/or failure to train in "narrow circumstances"
> involving a single incident such as "a city that arms its police force with firearms
> and deploys the armed officers into the public to capture fleeing felons without
> training the officers in the constitutional limitation on the use of deadly force."
> *Connick v. Thompson,* —— U.S. ——, ——, 131 S.Ct. 1350, 1361, 179 L.Ed.2d
> 417 (2011) (citing and quoting *Canton v. Harris,* 489 U.S. 378, 390, n. 10, 109
> S.Ct. 1197, 103 L.Ed.2d 412 (1989)). In these "rare" situations, the "deliberate
> indifference" standard may be met because "the unconstitutional consequences of
> failing to train could be so patently obvious that a city could be liable under §
> 1983 without proof of a pre-existing pattern of violations." *Id.*

Blair v. City of Pittsburgh, Civ. Act. No. 14-1473, 2015 WL 4162400, at *3 (W.D. Pa. July 9,

2015).

Ordinarily, but not always, a pattern of similar constitutional violations by untrained employees would be required to establish the requisite "deliberate indifference" in a failure to train case, Connick v. Thompson, 563 U.S. 51, 62 (2011) (acknowledging though narrow range, single incident liability for failure to train envisioned by Canton still exists). Even without similar prior instances, the need for training regarding the use of firearms against fleeing felons in vehicles seems to the court patently obvious. Indeed, the Pittsburgh policy referenced by Davenport acknowledges that similar policies were instituted elsewhere due to incidents involving officers firing upon moving vehicles. Under Pittsburgh's argument, each municipality would be able to avoid a showing of deliberate indifference to the rights of its citizens for failing to train its armed officers where it waited until it had enough such deadly force violations in its jurisdiction before instituting patently necessary training. The court does not countenance this approach and City of Canton instructs otherwise.

Even though officers may have been aware of some policy in place, (ECF No. 112-1 at 87, 112-2 at 38, 112-3 at 63), there is evidence as to lack of training in a critical area in order to protect individuals with which the police will come in contact when they encounter a fleeing suspect in a moving vehicle. It does not escape the court's attention that in viewing the evidence in the light most favorable to Davenport that several of the off-duty police officers encountering the vehicle in a short distance and at about the same time acted in precisely the same manner towards the Burris vehicle and its passenger— shooting from the side through the passenger compartment beginning with shots fired when that vehicle was not travelling at high rates of speed and had not come into contact with another vehicle and ending with shots fired when the vehicle had come to a stop and that it was done so with the knowledge of Davenport's presence.

46

The failure to provide such critical training appears to be one of those rare circumstances envisioned that the "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." Canton v. Harris, 489 U.S. at 390 n. 10. In sum, Davenport argues that there are genuine issues of material fact as to whether the failure to train officers on the use of deadly force against a moving vehicle or its occupants and that viewing the evidence in the light most favorable to her "a reasonable jury could conclude that failure to train Pittsburgh's officers in the use and constitutional limitations of deadly force showed a deliberate indifference to the rights of citizens [with whom] its untrained officer would come into contact." (ECF No. 111 at 7). The court agrees.

The court further finds that viewing the evidence in the light most favorable to Davenport, that a reasonable jury could find the failure of the City of Pittsburgh to train its officers regarding the use of deadly force against individuals in a moving vehicle manifested deliberate indifference and was the moving force behind the alleged violation of Davenport's constitutional rights. Therefore, the City of Pittsburgh's motion for summary judgment on the § 1983 claims against it will be denied.

### 5. State Law Claims against Pittsburgh Defendants

The Pittsburgh Defendants argue that they are entitled to summary judgment on the state law claims for assault and battery and intentional infliction of emotional distress, which are brought against the Pittsburgh police officers and the City of Pittsburgh, on the basis that Davenport failed to produce evidence that the Pittsburgh police officers acted to intentionally harm her. (ECF No. 96 at 9). They also argue that the reasonableness of the force determines whether an officer commits an assault and battery, Renk v. City of Pittsburgh, 641 A.2d 289 (Pa. 1994), that the force was reasonable, and therefore, they are entitled to summary

47

judgment.  The court has determined that there is an issue of fact as to the reasonableness of the deadly force used by the Pittsburgh police officers under the circumstances and whether they intentionally shot at Davenport.  Accordingly, Pittsburgh police officers Schweitzer, Matakovich, Kennedy and Gorecki are not entitled to summary judgment on Davenport's claims for assault and battery.

Regarding the claim of intentional infliction of emotional distress, the court must determine "in the first instance whether the [Pittsburgh police officers'] conduct may reasonably be regarded as so extreme and outrageous to permit recovery." Johnson v. Caparelli, 625 A.2d 668, 671 (Pa. Super. 1993).  Pittsburgh Defendants assert that Davenport cannot show as required to make out a claim for the tort that the Pittsburgh police officers "by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress." (ECF No. 96 at 10).   The Pittsburgh Defendants assert that the Pittsburgh police officers' acted appropriately under the circumstances and further argue that their conduct did not go beyond the bounds of decency.   (ECF No. 96 at 11).  Again, based on the analysis *supra* that a reasonable jury could find that the Pittsburgh police officers intentionally and indiscriminately shot at Davenport, who was merely a passenger in Burris' vehicle, and could find that their conduct shocks the conscience, the Pittsburgh police officers' conduct in this scenario of events would go beyond the bounds of decency and be so extreme and outrageous as to permit recovery.  Accordingly, Pittsburgh police officers Schweitzer, Matakovich, Kennedy and Gorecki are not entitled to summary judgment on the state law claims.

Finally, Pittsburgh Defendants argue under Pennsylvania's Tort Claims Act, 42 Pa. Const. Stat. § 8541, that Pittsburgh is immune from suit as to the state law claims.  Section 8541 provides:

> Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person.

42 Pa. Cons. Stat. § 8541. The Act provides in § 8542 certain enumerated exceptions to immunity, but requires that the injury be caused by negligence under § 8542(a)(2). Davenport concedes that these state law claims are not enforceable against Pittsburgh. (ECF No. 108 at § 11). Accordingly, Pittsburgh is entitled to summary judgment in its favor on the claims against it for assault and battery and intentional infliction of emotional distress. See Panas v. City of Philadelphia, 871 F.Supp.2d 370, 376 (E.D. Pa. 2012).


V.      CONCLUSION

Given the foregoing, viewing the evidence in the light most favorable to Davenport, summary judgment in favor of the Homestead Defendants and against Davenport on all of her claims against the Homestead Defendants, as stated in the First and Second (renamed as such) causes of action is proper. Accordingly, the court will grant the Homestead Defendants' motion for summary judgment (ECF No. 91) and deny Davenport's motion for summary judgment (ECF No. 98). As to the Pittsburgh Defendants' motion for summary judgment (ECF No. 95), the court will grant the motion in part and deny the motion in part as summary judgment against Davenport is appropriate only as to: the claims against Officer Boyko under the Third, Fifth, Seventh and Eighth causes of action, the claims against former Chief Nate Harper under the Fourth and Sixth causes of action as duplicative of the claims against the City of Pittsburgh, and the state law claims against the City of Pittsburgh under the Seventh and Eighth causes of action and as conceded by Davenport. Pittsburgh Defendants' motion for summary judgment will be denied in all other respects. Thus, remaining for trial are the § 1983 claims against Pittsburgh police officers Schweitzer, Matakovich, Kennedy and Gorecki

under the Third and Fifth causes of action, the § 1983 claims against Pittsburgh under the Fourth and Sixth causes of action, and the state law claims for assault, battery, and intentional infliction of emotional distress against Pittsburgh police officers Schweitzer, Matakovich, Kennedy and Gorecki under the Seventh and Eighth causes of action.

An appropriate order will follow.

Date: September 30, 2016

s/David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:    J. Kerrington Lewis, Esquire
Michael E. Kennedy, Esquire
Matthew S. McHale, Esquire
Mark R. Hamilton, Esquire
Jeffrey T. Criswell, Esquire
Lourdes Sanchez Ridge
Bryan Campbell, Esquire
Allison N. Genard, Esquire